INTERNATIONAL CHAMBER OF COMMERCE

INTERNATIONAL COURT OF ARBITRATION

Case No. 28044/PDP (EA)

———————

## NORTH POINT RX, LLC (U.S.A.)

## Applicant

vs.

## KEY THERAPEUTICS, INC. (U.S.A.)

## Responding Party

———————

***On Application for Emergency Measures and
Motion for Sanctions and Modification***

———————

# FINAL ORDER

———————

1.   The Emergency Arbitrator issues this Final Order following completion of proceedings on the Emergency Application, including the motion for sanctions and for modification of the Order issued and notified on 14 September 2023 ("**original Order**").

**I.   THE PARTIES TO THE PROCEEDING AND THEIR COUNSEL**

2.   Applicant ("**North Point**") is:

NORTH POINT RX, LLC
109 E. 17th St.
Suite 450
Cheyenne, WY 82001
U.S.A.

3.   North Point is represented by:

Kevin M. Eddy
BLANK ROME
501 Grant St.,
Suite 850

-1-



Pittsburgh, PA
15219
U.S.A.

Telephone: +1 412 932-2757
Emails*:
*Kevin.eddy@blankrome.com*

4.  Responding Party ("**Key**") is:

KEY THERAPEUTICS, INC.
232 Market St.
Building K
Flowood, MS 39232
U.S.A.

5.  Key is represented by:

Joshua C. McCrory
MCCRORY LAW FIRM, P.C.
200 E. Government St.
Brandon, MS, 39042
U.S.A.
Telephone: +1 601-397-1064
Email: Josh@mlfattorneys.com

## II.    THE EMERGENCY APPLICATION, APPOINTMENT OF EMERGENCY ARBITRATOR, AND ISSUANCE OF 14 OCTOBER 2023 ORDER

6.  The earlier proceedings in this matter are described in the original Order.  The original Order is incorporated by reference into this Order and constitutes a part of it, except to the extent modified in this Order.

## III.   MOTON FOR SANCTIONS AND MODIFICATION

7.  Late on Friday, 22 September 2023, North Point submitted a "MOTION FOR SANCTIONS AND TO MODIFY THE EMERGENCY ARBITRATOR'S SEPTEMBER 1, 2023 ORDER."  ("**Motion**").

8.  In support of the Motion, North Point tendered the (unsworn) Witness Statement of Tyler Tedrow dated 22 September 2023 (referred to in North Point's Motion as "**Final Tedrow**") and the (unsworn) Witness Statement of Deborah Livornese dated 21 September 2023 ("**Livornese**") offered as an expert on federal drug regulation.  Both witness statements are supported by documentary exhibits.

9. The Emergency Arbitrator invited Key to submit a response to the Motion by 5:00 p, EDT on Monday, 25 September 2023. On 25 September 2023, the Emergency Arbitrator *sua sponte* issued a Procedural Timetable that (i) extended Key's time to respond until noon on 26 September 2023, (ii) provided that North Point could respond by noon on 27 September 2023, and (iii) reserved the question of a possible rejoinder until after submission of any reply.

10. On 27 September 2023, the Emergency Arbitrator granted North Point's request for a extension of the time to file a reply until noon, 28 September 2023, and requested a response to certain points made in Key's opposition papers, as discussed *infra*. Later on 27 September 2023, North Point filed a reply in support of its motion. On the same date, the Emergency Arbitrator invited Key to submit any rejoinder by 2:00 pm on 28 September 2023.

11. In support of its Motion, North Point shows, through the Final Tedrow statement and attached bank records, that Key has not complied with any of the directions included in the original Order, specifically the directions to (i) restore $250,000 to the operating account maintained under the Agreement within five business days, (ii) pay North Point $5,000 on account of its attorneys' fees, and (iii) to reimburse North Point $25,000 as a *pro rata* portion of the costs of this proceeding advanced by North Point.

12. As a remedy for these failures to comply with the original Order, North Point's Motion requests –

> "the relief previously requested – specifically an order in North Point's favor compelling Key to comply with Section 10.3.3 of the Agreement and transfer the NDAs from itself to North Point's designee, Ajenat Pharmaceuticals, LLC ('**Ajenat**')."

13. In support of this proposed remedy, North Point tenders information that it recognizes had not been before the Emergency Arbitrator when this request was sought as interim or conservatory measures under Article 29 of the ICC Rules. Specifically, North Point notes that in the original Order the "balance of equities" had been found to be "neutral."

14. To alter the balance, North Point submits documentary evidence to show that there is a genuine shortage of Desoxyn, either in its branded form or its generic formulation, and that this shortage is adversely affecting treatment of patients – children over six years old diagnosed with ADHD (attention deficit disorder with hyperactivity). The FDA has determined that there is such a shortage. (See Livornese para. 14 and Exh. D).

15. In addition, only three manufacturers are licensed to produce and distribute this drug, two generic manufacturers who apparently are not manufacturing it, and Key as the current holder of the NDA for Desoxyn, which (according to Key's earlier submission) is withdrawing from the market except for fulfilling prior orders.

16. North Point, through the Final Tedrow statement, contends that Key is no longer authorized to manufacture Desoxyn under the NDA, because Key itself has terminated the Agreement under which it was authorized to do so. Tedrow also explains that, without new

manufacture, the existing inventory of this drug will run out within a few months.  Tedrow also states that it will take three months to restore the supply of the drug to the market once the NDA is transferred to Ajenat.  (Finat Tedrow para. 11).

17.  Through the Livornese witness statement, North Point confirms the existence of a shortage of the drug and the absence of legally authorized alternatives to its manufacture, except pursuant to the Desoxyn NDA that is in dispute between the Parties.  Moreover, Livornese provides new evidence from an experienced regulatory lawyer that undermines the significance of Key's original objection to transferring the NDA immediately rather than just in due course, as Key admitted that it eventually is contractually obliged to do.

18.  Key's objection was that Key needs to continue to fill orders previously placed and accepted.  Livornese opines, however:

"The transfer of an NDA does not cause dugs previously manufactured in compliance with an NDA to become an unapproved drug.  Existing inventory manufactured in compliance with the NDA is not prohibited from being sold.  The transfer of the NDA to a new owner does not mean that a third party (like Key) cannot fill existing orders with existing inventory that was manufactured under the NDA."  (Livornese para. 19).

19.  North Point argues that the relief that it seeks is an appropriate measure to *coerce compliance* with the original Order.  North Point also contends that this relief is an "appropriate *sanction*" for allegedly contumacious refusal to comply with the original Order.  As a third ground for the same form of relief, North Point asks for *modification* of the original Order to direct immediate transfer of the Desoxyn NDA on the basis of new evidence affecting the balance of equities.

20.  In addition, North Point seeks an award of (i) an additional $8,500 in attorneys' fees that it says that it has incurred in having to file the present motion, plus (ii) $4,750 to obtain the expert witness statement from Livornese.

21.  On 26 September 2023, counsel for Key submitted a short email referring to an attached bank ledger, which was not attached, describing possible refunds that Key might have to pay to customers for any Desoxyn that might be returned, and containing the following statement:

"In response to the motion to modify the Emergency Order regarding the NDA transfers, I would now for the third time request that NorthPoint direct someone from Ajenat to contact Key to facilitate the NDA transfers.  It should be made clear that NorthPoint is not an FDA approved entity.  Desonyx is a highly regulated narcotic.  Key is eager to transfer the NDA's but this needs to be coordinated with Ajenat.  It only takes a phone call.  This issue should have been resolved weeks ago; there is absolutely no reason why Ajenant should not be in contact with Key."

22.  The Emergency Arbitrator immediately noted the absence of the referenced ledger sheets, requested that the omission be corrected, and asked that counsel promptly respond to the following questions:

• When and to whom did you previously communicate a "request that NorthPoint direct someone from Ajenat to contact Key to facilitate the NDA transfers"?
• Is it Key's position that it is prepared to transfer the Desoxyn NDA to Ajenat as soon as Ajenat coordinates with Key?
• If not, when is Key willing to arrange to make the transfer?

23.     On 26 September 2023, Key submitted a single sheet listing various financial transactions, without further explanation, and included the following statement:

"1.  I have communicated the request to Mr. Eddy on Sept. 11.  My understanding is that Mr. Sims (Key) has previously made the same request directly to NorthPoint.

"2.  ***Key is indeed prepared to transfer the NDA's for both drugs to Ajenat as soon as Ajenat coordinates with Key***.

"We were very candid in our opposition memorandum; Key, through Mr. Sims and out of frustration with Mr. Tedrow, sent a notice to terminate the subject Agreement. Jennifer Daniels, on behalf of NorthPoint, frequently sent notices to myself and/or Mr. Sims over the next 180 days regarding the impending termination.  However, the relationship between Mr. Tedrow and Mr. Sims continued as if no termination was imminent and Key made absolutely no attempt to wind down the business.  Key is now very aware of NorthPoint's position on the matter and is beyond ready to end its relationship with NorthPoint.  This is a simple matter with a Schedule III or IV drug. But for a Schedule II drug that has until recently been actively marketed, the winding down process is exponentially more difficult for Key.  That is because Key is an FDA approved business like Ajenat (but unlike NorthPoint).  The contracts and agreements for the sale and distribution of Desoxyn are all with Key and not NorthPoint.  For example, Key has a 3 year distribution agreement with Cardinal Health.  NorthPoint has to answer to virtually no one.  ***Key communicated with Recordati on the original transfer.  Key will do the same with Ajenat; this should not necessitate the involvement of either yourself or other attorneys***. -***"  (Emphasis added).

24.     In its 27 September 2023 Reply in support of its Motion, North Point notes that the ledger sheet submitted by Key (*supra*) shows that Key has failed to comply with the terms of the original Order (i) by making further substantial financial transaction in the operating account without consultation and approval, including additional, substantial, and unapproved withdrawals, and (ii) by failing to restore and maintain $250,000 as required. North Point also contends, without any contrary showing by Key, that Key has failed to comply with the directions in the original Order to make payments to North Point on account of costs and attorneys' fees.

25.     With respect to the transfer of the NDAs to Ajenat, North Point contends that no consultation is necessary and, instead, that Key should simply prepare the transfer documents that North Point attached as exhibits to its original Application.  Nevertheless, North Points adds:

"That being said, in an effort to speed along the transfer, North Point is willing to permit Key to have the requested conversation with Ajenat subject to certain reasonable conditions.  Those conditions have to [sic] been communicated to counsel for Key.

However, nothing should delay the transfer of the NDAs. * * * Therefore, if Key continues to refuse to transfer the NDAs, for the reasons set forth in the Motion and this Reply, North Point respectfully request an order compelling Key to transfer the NDAs within three business days."

26.    Key did not take advantage to submit any rejoinder. Accordingly, the record stands as described *supra*.

## IV.    AUTHORITY TO ENTERTAIN MOTION

27.    The arbitral process assumes that parties will comply voluntarily with orders and awards. See, *e.g.* Article 22(5) of the ICC Rules. Article 29(2) provides, specifically, that the parties in a proceeding before an emergency arbitrator "undertake to comply with any order made by the emergency arbitrator."

28.    Section 9 of the Federal Arbitration Act, 9 USC § 9, establishes procedures for judicially enforcing compliance with certain arbitral orders and awards.

29.    When issues of compliance or possible "sanctions" for non-compliance with an order of an emergency arbitrator arise within the arbitral process, the issues are normally for consideration by the *arbitral tribunal* in the related plenary arbitration. Thus, Article 29(4) of the ICC Rules provides:

"The arbitral tribunal shall decide upon any party's requests or claims related to the emergency arbitrator proceedings, including the reallocation of the costs of such proceedings and any claims arising out of or *in connection with the compliance or non-compliance with the [emergency arbitrator's] order*." (Emphasis added).

30.    In the present matter, however, it appears that no arbitral tribunal has yet been constituted. Therefore, the issue is whether and to what extent the Emergency Arbitrator retains jurisdiction (and is not *functus officio*) to grant the kind of relief that North Point is seeking in its Motion.

31.    North Point invokes Article 6(8) of Appendix V to the ICC Rules, which provides:

"Upon a reasoned request by a party made prior to the transmission of the file to the arbitral tribunal pursuant to Article 16 of the Rules, the emergency arbitrator may *modify*, terminate or annul the Order." (Emphasis added).

32.    Neither of the provisions just quoted refers to "sanctions" as such. It is implicit in the authority of the *arbitral tribunal* to deal with issues of "non-compliance" is that, like any other type of adjudicatory tribunal, an arbitral tribunal must have the power to formulate some measures reasonably calculated to secure compliance with its orders. This is not the occasion, however, for extensively analyzing the power of an arbitral tribunal to deal with issues of non-compliance, beyond noting that an award of costs is a typical remedy for contumacious behavior.

-6-

33.     The ICC Rules contain no provision authorizing an Emergency Arbitrator to impose "sanctions."   Accordingly, that form of relief is unavailable in response to the pending Motion.

34.     There is, however, no persuasive reason to assume that the ICC Rules leave a successful applicant in limbo, when there is a delay in constituting the arbitral tribunal and until the file is transmitted to it.  In this matter, North Point joins with its request for sanctions a request to "modify" the original Order under the authority provided in Article 6(8) of Appendix V of the ICC Rules.

35.     That authority provides a sufficient basis for ordering the relief requested, if otherwise warranted.

36.     The Emergency Arbitrator' authority to "modify" an emergency order is broader than the limited authority reserved to an arbitral tribunal to change its final *award*, which under Article 36 of the ICC Rules is limited to correcting computational, clerical, or typographical errors.  I interpret the Rule governing the residual authority of an emergency arbitrator as extending to making a *substantive modification* to the earlier order that a "reasoned request" shows to be justified.

37.     The authority to "modify" the original Order in this matter, pending any further action by the arbitral tribunal once constituted, should be understood as allowing the Emergency Arbitrator to alter the original Order in light of demonstrated failure to comply with its original terms, at least where, as here, the intervening circumstances show a justification for interim or conservatory measures that may not have seemed warranted at the time.

38.     The questions at hand are whether North Point's requests are adequately reasoned and whether the relief that it seeks is justified under Article 6(8) of Appendix V as a *modification* of the original Order.

## V.     DISCUSSION

39.     The original Order concluded that the application for immediate transfer of the two NDA's was not admissible as part of a request for interim or conservatory measures under Article 29, because that is the ultimate relief being sought in the plenary arbitration.  In any event, the original Order weighed the traditional factors for granting interim measures and, although finding that North Point has a high probability of success on this claim – indeed, Key virtually conceded it – the other factors did not compel the requested relief.

40.     The additional information submitted along with the pending Motion now shows that this kind of interim or conservatory measure satisfies all of the tests (as discussed in the original Order) that are used in evaluating requests for such measures: probability of success on the merits, irreparable injury, and balance of private and public interests or equities

41.     In particular, the Order concluded that there was no likelihood of irreparable injury, because an award for breach damages might be sufficient.  To secure the viability of such a remedy, the original Order directed Key to restore $250,000 to the required operating account and to refrain from making further withdrawals (except in the ordinary course of

-7-

business) without consultation and approval. The Order also required prompt payment of a total of $30,000 on account of costs and attorneys' fees.

42. In addition, the evidence at the time was not sufficient to tilt the "balance of equities" in North Point's favor.

43. Circumstances have changed regarding those factors. As North Point argues, Key's failure to comply with the financial protections that were contained in the original Order, in order to secure the sufficiency of any eventual award for damages suggests, indicates that Key may be in financial distress. (See Motion at 6-7). The provision requiring financial security has not been achieved, because Key has not complied with the original Order. Thus, it now appears more likely that the probability of success in the plenary arbitration on any claim for damages may be hollow and that North Point's injury from Key's failure to honor the Agreement and to comply with the original Order may be "irreparable" as a practical matter in the absence of further interim or conservatory measures.

44. Referring to the question of the balance of equities and the public interest, the new evidence provides a strong tilt away from the original sense of "neutrality." There now has been shown to be a demonstrated public need for a highly regulated pharmaceutical product used to treat children and others diagnosed with ADHD. No one else is manufacturing the product. (Final Tedrow paras. 5-6). Key is unable to do so. According to the expert testimony from Livornese, Key may lawfully fill existing orders from its inventory, even if it transfers the Desoxyn NDA. (Livornese para. 19). Moreover, it will take three months for North Point's new manufacturing and marketing agent, Ajenat, to get the drug out to the market, once it obtains the right to operate under the NDA. (Final Tedrow paras. 6-13).

45. Under all these circumstances, Key has no significant interest in retaining the NDA instead of North Point's new agent, and the public interest points strongly toward facilitating the prompt restoration of a channel of manufacture distribution of Desoxyn.

46. An order to this effect, which North Point says can be used to pursue FDA administrative approvals, constitutes an appropriate form of interim or conservatory measures. It requires the immediate transfer of valuable property that Key has conceded that it eventually must return to North Point (or North Point's designee, Ajenat). In light of the refusal to comply with the financial terms of the original Order, there is no good reason to defer to Key's choice of the timing for that action, even assuming *arguendo* that Key would voluntarily honor its own concession at some time of its choosing.

47. It is more justifiable for North Point, or more precisely its new agent, Ajenat, to be in control of the Desoxyn NDA and the rights thereunder while the plenary arbitration wends its way along. If, for some reason that even Key has not suggested, the arbitral tribunal were to find that North Point was not entitled to retrieve control of the NDA from Key, the arbitral tribunal could craft its own relief to deal with that unlikely hypothetical.

48. In its various responses to the pending Motion (see paras. 21, 23 *supra*), Kay insists that it has been, and remains, willing to transfer the NDA for Desoxyn as long as it can coordinate

with Ajenat.  There is no clear reason why this kind of coordination should be burdensome or a cause for delay.  Under the circumstances, both North Point, in consultation with Ajenat, and Key should cooperate to arrange the necessary steps to effectuate the transfer.

49.  To encourage Key's compliance with this interim, conservatory measure, the provision for an award of *further* fees and costs for this phase of the proceeding should be conditional. Key may avoid *further* fees and costs, if it promptly arranges for the transfer of the NDA to North Point's agent, Ajenat, pending any further action of the arbitral tribunal once constituted.

## VI.   **DECISION**

50.  For the reasons discussed *supra*, North Point has shown an entitlement to additional relief.

51.  Accordingly, Paragraph 128 of the original Order dated and notified on 14 September 2023 in this matter is **_modified_** to add a new subparagraph (d) and accordingly to provide:

"128.   After full consideration of the Parties' submissions, and in light of the factors discussed above, North Point's request for relief regarding emergency financial conservatory measures is **_granted only to this extent_**:

"(a) Key is **Ordered** to deposit in the bank account ("**Bank Account**") opened and maintained in accordance with Section 3 of Schedule A to the Agreement ("**Section 3**") the sum of $250,000 (two hundred and fifty thousand dollars) within five business days following the date of notification of this Order.

"(b) Key is **Ordered** to comply with the requirement in Section 3 that all "Gross Sales" as defined in the Agreement are deposited in the Bank Account.

"(c) Key is **Enjoined** from making any disbursements from, or otherwise encumbering, the Bank Account, except (i) to pay "Commercialization Expenses" as defined in Section 3, or (ii) as otherwise approved in writing by North Point, which approval shall not be unreasonably withheld.

"(d) Key is **Ordered** to execute and deliver to North Point or its designee, within five business days following notification of this Order, the documents necessary to transfer the NDA for Desoxyn to Ajenat Pharmaceuticals LLC."

52.  With respect to the question of costs and attorneys' fees, for the reasons discussed *supra*, North Point has shown an entitlement to an *additional* award of attorneys fees in the amount of $8.500 and an *additional* award of costs in the mount of $4.750, if but only if Key fails to comply with subparagraph 128(d).

53.  Accordingly, Paragraph 134 is **_modified_** to add a new subparagraph (c) and to provide:

"134.   Under all the circumstances, North Point's request for "award of attorneys' fees, costs, and arbitrators' fees in favor of North Point and against Key" is **_granted only to this extent_**:

"(a) Key is **Ordered** to pay North Point $5,000 (five thousand dollars) on account of North Point's attorneys' fees.

-9-

"(b) Key is **Ordered** to reimburse North Point, pursuant to Article 7(3) of Appendix V of the Rules, the sum of $25,000 (twenty-five thousand dollars) toward the Costs of these emergency arbitrator proceedings.

"(c) If Key fails to comply with subparagraph 128(d) as added, Key is **Ordered** to pay Key (i) an additional $8,500 (eight thousand and five hundred dollars) on account of attorneys' fees and (ii) an additional $4,750 (four thousand and seven hundred and fifty dollars) toward the Costs of these emergency arbitrator proceedings."

54.    For avoidance of doubt, in all other respects the original Order is reaffirmed and remains in force except to the extent modified by this Order.

55.    Except to the extent explicitly granted, North Point's requests for relief in the Amended Application under Article 29 and in its Motion for Sanctions and Modification are ***denied***.

56.    This Order, with the provisions incorporated from the original Order, constitutes the Final Order in these emergency arbitrator proceedings under Article 29 of the ICC Rules.


**SO ORDERED.**

**PHILIP ALLEN LACOVARA**
**Emergency Arbitrator**


**Dated: 2 October 2023**

**Place of the Emergency Arbitrator proceedings:**
**New York, New York, USA**

-10-