INTERNATIONAL CHAMBER OF COMMERCE

INTERNATIONAL COURT OF ARBITRATION

Case No. 28044/PDP (EA)

––––––––

**NORTH POINT RX, LLC (U.S.A.)**

**Applicant**

vs.

**KEY THERAPEUTICS, INC. (U.S.A.)**

**Responding Party**

––––––––

*On Application for Emergency Measures and*
*Further Motion for Sanctions and Modification*

––––––––

# MODIFIED

# FINAL ORDER

––––––––

1.  The Emergency Arbitrator issues this **Modified Final Order** following completion of proceedings on the Emergency Application, including the motions for sanctions and for modification of the Order issued and notified on 14 September 2023 ("**original Order**") and of the Order dated and notified to the Parties on 2 October 2023 ("**Final Order**").

## I.   THE PARTIES TO THE PROCEEDING AND THEIR COUNSEL

2.  Applicant ("**North Point**") is:

NORTH POINT RX, LLC
109 E. 17th St.
Suite 450
Cheyenne, WY 82001
U.S.A.

-1-



3.      North Point is represented by:

Kevin M. Eddy
BLANK ROME
501 Grant St.,
Suite 850
Pittsburgh, PA
15219
U.S.A.
Telephone:  +1  412  932-2757
Emails*:*
*Kevin.eddy@blankrome.com*

4.      Responding Party ("**Key**") is:

KEY THERAPEUTICS, INC.
232 Market St.
Building K
Flowood, MS 39232
U.S.A.

5.      Key is represented by:

Joshua C. McCrory
MCCRORY LAW FIRM, P.C.
200 E. Government St.
Brandon, MS, 39042
U.S.A.
Telephone: +1 601-397-1064
Email: Josh@mlfattorneys.com

## II.      THE EMERGENCY APPLICATION, APPOINTMENT OF EMERGENCY ARBITRATOR, AND ISSUANCE OF THE ORIGINAL ORDER AND THE FINAL ORDER

6.      The earlier proceedings in this matter are described in the original Order and the Final Order.  The original Order and the Final Order are incorporated by reference into this Modified Final Order and constitute a part of it, except to the extent modified hereby.

## III.      FURTHER MOTON FOR MODIFICATION

7.      On 9 October 2023, North Point filed an addition motion ("**further Motion**") to modify, addressing both the original Order and the Final Order and requesting further relief.  The grounds for the motion are described in the further Motion and by the Affidavit of Tyler Tedrow ("**Tedrow Aff**.") sworn to on 9 October 2023.

8.      In brief, North Point states that Key has not complied with any of the provisions of the Final Order, specifically the directions to restore funds to the venture's operating bank account (Tedrow Aff. para 12).  Moreover, according to North Point, Key has blocked

North Point from access to the bank records.  North Point requests a modification to unblock access and renews its original application for an order requiring Key to restore *all* of the funds previously withdrawn without agreement.

9.  North Point also contends that Key has failed to facilitate the transfer of the Desoxyn NDA, despite Key's representation to the Emergency Arbitrator that it was willing to consult with Ajenat to arrange the transfer and despite the direction in the Final Order to do so. According to Tedrow, Key failed to participate in either of two telephone calls arranged for that purpose.  (*Id*. paras.  13-16).

10.  North Point states, for the first time, that merely having Key sign over the NDAs to North Point or Ajenat, as directed in the Final Order, would not be sufficient, because the FDA requires that the transfer be effected by an electronic filing and by the transfer of "Common Technical Documents" to North Point.  (Tedrow paras. 18-19).  Accordingly, North Point asks for a modification to specify that Key must follow that process.

11.  In addition, referring to market data for the sale of the pharmaceutical for which Desoxyn is the registered brand name, North Point claims that the failure to transfer the NDA is depriving North Point (and presumably it agent Ajenat) of daily revenues of $31,000 (based on annualized market sales of approximately $11.3 million).  (Tedrow Aff. paras. 26-32).

12.  Furthermore, Tedrow states that North Point had transferred to Key a supply of Desoxyn that North Point had originally obtained from Recordati and asserts that North Point is "legitimately concerned" that Key will relabel that supply with Key's own name and "claim an ownership in the Desoxyn."  (Tedrow Aff. para.  23).

13.  In order to "encourage compliance" with the Emergency Arbitrator's orders, especially if North Point must seek enforcement under Section 9 of the Federal Arbitration Act, North Point requests "imposition of a daily fine" until compliance is achieved.

14.  In light of these contentions, North Point requests that the Emergency Arbitrator amend the Final Order so that Paragraph 128 reads as follows:

"128.  After full consideration of the Parties' submissions, and in light of the factors discussed above, North Point's request for relief regarding emergency financial conservatory measures is *granted only to this extent*:

"(a) Key is **Ordered** to deposit in the bank account ('Bank Account') opened and maintained in accordance with Section 3 of Schedule A to the Agreement ('Section 3') the sum of $660,012.27 (six hundred and sixty thousand and twelve dollars at twenty-seven cents) within five business days following the date of notification of this Order.

"(b) Key is **Ordered** to comply with the requirement in Section 3 that all 'Gross Sales' as defined in the Agreement are deposited in the Bank Account.

"(c) Key is **Enjoined** from making any disbursements from, or otherwise encumbering, the Bank Account, except (i) to pay 'Commercialization Expenses' as defined in Section 3, or (ii) as otherwise approved in writing by North Point, which approval shall not be unreasonably withheld. Key is further Enjoined from prohibiting North Point's access to view transactions occurring with the Bank Account and is Ordered to restore North Point's visibility to the Bank Account.

"(d) Key is **Ordered**. within 24 hours after the issuance of this order, to execute and submit to the FDA all required documents and information to transfer the NDAs for Desoxyn and Tranxene to Ajenat by using the letters attached to the Emergency Petition at Exhibits C and D, which must appear on Key letterhead, and provide North Point with a copy of all regulatory documentation concerning the NDAs that has previously been provided to Key; and otherwise cooperate with North Point by complying with all requests by North Point in the transfer process set forth in Section 10.3.3 of the Commercialization Agreement; and,

"(e) Key is **Enjoined** from re-labeling any remaining inventory of Desoxyn with Key's label and Key is further ordered to instruct CORD logistics/ Cardinal 3PL to work with Ajenat on having the inventory transferred to Ajenat

and to modify Paragraph 134 as follows:

"134. Under all the circumstances, North Point's request for 'award of attorneys' fees, costs, and arbitrators' fees in favor of North Point and against Key' is *granted only to this extent*:

"(a) Key is **Ordered** to pay North Point $17,000 (five thousand dollars) on account of North Point's attorneys' fees.

"(b) Key is **Ordered** to reimburse North Point, pursuant to Article 7(3) of Appendix V of the Rules, the sum of $29,750 (twenty-nine thousand and seven hundred and fifty d dollars) toward the full filing Costs of these emergency arbitrator proceedings.

"(c) If Key fails to comply with subparagraph 128(d) as added, Key is **Ordered** to pay North Point $31,000 for each and every day Key is not in compliance."

15.   On 11 October 2023, the Emergency Arbitrator acknowledged receipt of the Further Motion and informed counsel:

1.  Key is invited to file a response.

2.  Both North Point and Key are invited to address, *inter alia*, the authority *vel non* of an Emergency Arbitrator appointed pursuant to Article 29 of the ICC Rules to impose sanctions, including penal sanctions and coercive sanctions relating to compliance or non-compliance with earlier orders.

-4-

    3.   Any further submissions should be made by 5:00 p.m. Eastern on Friday, 13 October 2023.

16. On 13 October 2023, North Point filed a memorandum of law addressing the issue raised in paragraph 15 *supra*.

17. Key did not respond either to the further Motion or to the issue raised by the Emergency Arbitrator.

18. Meanwhile, on 12 October 2023, the Secretariat had notified the Parties that the President of the ICC Court had fixed an additional payment for these proceedings and had invited the Emergency Arbitrator to refrain from acting on the further Motion until the ICC received the payment.

19. On 13 October 2023, the Emergency Arbitrator acknowledged receipt of North Point's memorandum of law on that date and further stated:

> "I also take note of the correspondence from the Secretariat dated 12 October 2023 (i) informing the Parties that the President of the ICC Court has fixed an additional payment to be made by the Applicant and (ii) inviting the Emergency Arbitrator to refrain from taking action on the pending motion until the additional payment is received.
>
> "Accordingly, the proceedings should be considered in suspension pending payment of the additional amount fixed by the President.  The Applicant is invited to bring to my attention any further developments that may affect the suspension of proceedings."

20. Later on 13 October 2023, North Point furnished evidence of a wire transfer in the amount of the additional payment that the ICC had fixed, thus satisfying the condition in the suspension of proceedings.  On 16 October 2023, the Secretariat acknowledged receipt of the requested additional advance on costs and informed the Parties that the matter could move forward.

## IV.    AUTHORITY TO ENTERTAIN MOTION; DISCUSSION

21. As stated in paragraph 27 of the Final Order, the arbitral process assumes that parties will comply voluntarily with orders and awards.  See, *e.g.* Article 22(5) of the ICC Rules.  With specific reference to proceedings like the present one, Article 29(2) provides that the parties in a proceeding before an emergency arbitrator "undertake to comply with any order made by the emergency arbitrator."

22. Section 9 of the Federal Arbitration Act, 9 USC § 9, establishes procedures for judicially enforcing compliance with certain arbitral orders and awards.

23. When issues of compliance or possible "sanctions" for non-compliance with an order of an emergency arbitrator arise within the arbitral process, the issues are normally for

consideration by the *arbitral tribunal* in the related plenary arbitration.  Thus, Article 29(4) of the ICC Rules provides:

> "The arbitral tribunal shall decide upon any party's requests or claims related to the emergency arbitrator proceedings, including the reallocation of the costs of such proceedings and any claims arising out of or ***in connection with the compliance or non-compliance with the [emergency arbitrator's] order***."  (Emphasis added).

24. In the present matter, it appears that no arbitral tribunal has yet been constituted.  Therefore, the issue is whether and to what extent the Emergency Arbitrator retains jurisdiction (and is not *functus officio*) to grant the kind of relief that North Point is seeking in its further Motion.

25. Article 6(8) of Appendix V to the ICC Rules provides:

> "Upon a reasoned request by a party made prior to the transmission of the file to the arbitral tribunal pursuant to Article 16 of the Rules, the emergency arbitrator may ***modify***, terminate or annul the Order."  (Emphasis added).

26. As explained in the Final Order, the Emergency Arbitrator accordingly retains authority to modify the earlier orders, so long as the modifications constitute interim or conservatory measures of the sort contemplated by Article 29.

27. The Emergency Arbitrator' authority to "modify" an emergency order is broader than the limited authority reserved to an arbitral tribunal to change its final award, which under Article 36 of the ICC Rules is limited to correcting computational, clerical, or typographical errors.  The Rule governing the residual authority of an emergency arbitrator extends to making a substantive modification to the earlier order that a "reasoned request" shows to be justified.

28. The authority to "modify" the original Order or the Final Order in this matter, pending any further action by the arbitral tribunal once constituted, allows the Emergency Arbitrator to alter the earlier orders in light of demonstrated failure to comply with their original terms, at least where, as here, the intervening circumstances show a justification for interim or conservatory measures that may not have seemed warranted at the time.

29. The questions at hand are whether North Point's requests are adequately reasoned and whether the relief that it seeks is justified under Article 6(8) of Appendix V as a modification of the Final Order

30. It is a separate question whether an emergency arbitrator may impose *sanctions*, including coercive penalties to secure compliance with orders issued pursuant to Article 29.  As explained in 32 of the Final Order, neither of the provisions just quoted in paragraphs 2 and 25 *supra* refers to "sanctions" as such.   The ICC Rules contain no provision authorizing an Emergency Arbitrator to impose "sanctions."

31. Nevertheless, North Point seeks a daily coercive "fine" in order to induce compliance.  In its memorandum of law filed on 13 October addressing this issue, North Point cites a New

York trial court decision in *Vitra, Inc*. v. *Ninety-Five Madison Co., L.P*., 2020 N.Y. Misc. LEXIS 3491 (N.Y. Sup. Ct. July 21, 2020), which it says supports the authority of an arbitrator to impose "daily monetary sanctions for non-compliance with arbitral mandates."

32. What North Point misunderstands is the limited nature of proceedings under Article 29. As explained in both the original Order and the Final Order, these proceedings are preparatory and ancillary to a plenary arbitration, the pursuit of which is a condition subsequent to any request for interim or conservatory measures under Article 29. Article 29 proceedings, including any orders issued by an emergency arbitrator, are to be dismissed, if an applicant fails to file a request for arbitration and to pursue that request. It is the arbitral tribunal, which is to be constituted in the plenary arbitration, that is explicitly empowered under Article 29(4) to deal with the consequences of non-compliance with the orders of an emergency arbitrator.

33. The daily "fine" or "sanction" that North Point is requesting – to coerce compliance with the prior orders to effectuate the transfer of the Desoxyn NDA to Ajenat – is based on what North Point calculates is the revenue that it allegedly is losing each day while Key fails to comply with the directions to transfer the NDA as an interim or conservatory measure. But that kind of claim for lost revenue is more appropriately considered a potential measure of damages in the plenary arbitration, assuming that North Point pursues it. It is not a "conservatory" measure within the meaning of Article 29.

34. The original Order had made clear (see paragraphs 74 *et seq*.) that North Point's request for an order compelling the transfer the Desoxyn NDA was, on its face, not admissible under Article 29, because it in effect would have awarded the final relief being sought in the request for (plenary) arbitration that North Point had filed. In the Final Order, however, such a transfer was ordered *conditionally* as a *conservatory* measure, pending the outcome of the plenary arbitration, because North Point had sufficiently shown that the balance of relevant factors warranted having North Point in control of the NDA while the plenary arbitration proceeded. (See paragraphs 43 *et seq*.). The explicit premise for that ruling was that the eventual financial consequences of Key's alleged breach of the Agreement, and any violation of any Emergency Arbitrator orders, would be resolved by the arbitral tribunal in the plenary arbitration.

35. Under all these circumstances, the request for imposition of a daily coercive fine in these proceedings is unwarranted.

36. North Point remains free, as noted in paragraph 28 of the Final Order, to apply for judicial enforcement of that Final Order (or the present Modified Final Order) pursuant to Section 9 of the Federal Arbitration Act. To the extent that a federal district judge orders compliance with these Orders, the court will have ample authority to take steps to compel compliance.

37. North Point seeks a modification to restore the more than half a million dollars that Key had withdrawn from the operating account rather than the sum required by the Final Order ($250,000) and to require that Key restore North Point's access to information about the venture's operating account. These are appropriate requests for interim, conservatory

measures and are warranted in light of the uncontested showing that Key is continuing to disregard measures ordered for the purpose of protecting North Point's ability to obtain effective relief in the plenary arbitration. The amount to be restored should be increased $500,000.

38. The Final Order directed that the Desoxyn NDA be transferred to North Point's agent as an interim measure. The Further Motion explains the mechanics by which the FDA requires that such a transfer is to be accomplished. Therefore, the Final Order should be modified to conform with FDA requirements.

39. Turning to another of is requests in the further Motion, North Point has not explained why it is "legitimately concerned" about a risk that Key may rebrand the Ricordati Desoxyn as if it belongs to Key. The Tedrow Affidavit does not provide any background for this speculation. Moreover, rebranding – or misbranding – a highly regulated Schedule II drug presumably would be a serious violation of law. There is no sufficient basis in the record for including such a prohibition in an order under Article 29.

40. North point also requests additional costs and attorneys' fees. In light of Key's failure to participate in these proceedings in any significant way, and in light of its unexplained failure either to take the steps that it earlier assured the Emergency Arbitrator that it was ready, willing, and able to take, which were embodied in the Final Order, North Point is entitled to recover additional attorneys' fees and the additional costs of these further proceedings, including the additional payment of $13,200 fixed by the President of the ICC Court on 12 October 2023.

## V.   **DECISION**

41. For the reasons discussed *supra*, North Point has shown an entitlement to additional relief.

42. Accordingly, paragraph 128 of the original Order dated and notified on 14 September 2023 and paragraph 51 of the Final Order dated and notified on 2 October 2023 are ***modified*** by substituting the following instead:

> "After full consideration of the Parties' submissions, and in light of the factors discussed above, North Point's request for relief regarding emergency financial conservatory measures is **granted only to this extent**:
>
> "(a) Key is **Ordered** to deposit in the bank account ("**Bank Account**") opened and maintained in accordance with Section 3 of Schedule A to the Agreement ("**Section 3**") the sum of $500,000 (five hundred thousand dollars) within five business days following the date of notification of this Modified Final Order.
>
> "(b) Key is **Ordered** to comply with the requirement in Section 3 that all "Gross Sales" as defined in the Agreement are deposited in the Bank Account.
>
> "(c) Key is **Enjoined** from making any disbursements from, or otherwise encumbering, the Bank Account, except (i) to pay "Commercialization Expenses" as defined in Section 3, or (ii) as otherwise approved in writing by North Point, which approval shall not be unreasonably withheld.

"(d) Key is **Enjoined** from prohibiting North Point's access to view transactions occurring with the Bank Account and is **Ordered** to restore North Point's visibility to the Bank Account.

"(e) Key is **Ordered**, within three business days after notification of this Modified Final Order, to execute and submit to the FDA (electronically, if required) all required documents and information to transfer the NDA for Desoxyn to Ajenat by using the letters attached to the Emergency Petition at Exhibits C and D, which must appear on Key letterhead, and provide North Point with a copy of all regulatory documentation concerning the NDA that has previously been provided to Key; and otherwise cooperate with North Point by complying with all requests by North Point in the transfer process set forth in Section 10.3.3 of the Commercialization Agreement;."

43. With respect to the question of costs and attorneys' fees, for the reasons discussed *supra*, North Point has shown an entitlement to an *additional* award of attorneys' fees and an *additional* award of costs.

44. Accordingly, paragraph 134 and the original Order and paragraph 53 of the Final Order are *modified* by substituting the following instead:

"Under all the circumstances, North Point's request for "award of attorneys' fees, costs, and arbitrators' fees in favor of North Point and against Key" is ***granted only to this extent***:

"(a) Key is **Ordered** to pay North Point $17,000 (seventeen thousand dollars) on account of North Point's attorneys' fees.

"(b) Key is **Ordered** to reimburse North Point, pursuant to Article 7(3) of Appendix V of the Rules, the sum of $42,950 (forty-two thousand and nine hundred and fifty dollars) toward the Costs of these emergency arbitrator proceedings.

45. For avoidance of doubt, in all other respects the original Order and the Final Order are reaffirmed and remain in force except to the extent modified by this Modified Final Order.

46. Except to the extent explicitly granted, North Point's requests for relief in the Amended Application under Article 29 and in its Motion and its Further Motion for Sanctions and Modification are ***denied***.

47. This Modified Final Order, with the provisions incorporated from the original Order and the Final Order, constitutes the final decision in these emergency arbitrator proceedings under Article 29 of the ICC Rules.

**SO ORDERED.**

**PHILIP ALLEN LACOVARA**
**Emergency Arbitrator**

-9-

**Dated: 18 October 2023**

**Place of the Emergency Arbitrator proceedings:**
**New York, New York, USA**