Confidential

**THIS COMMERCIALIZATION AGREEMENT** (the "**Agreement**") is effective as of the Effective Date

**BY AND BETWEEN**:

Key Therapeutics, Inc. a Delaware corporation having its principal place of business at 232 Market St. Bldg K, Flowood, MS 39232 ("**Key**"),

**AND:**

**NORTH POINT RX, LLC** a Limited Liability Corporation having its principal place of business at 109 E 17th St STE 450, Cheyenne, WY ("**North Point**") (Key and North Point may hereinafter collectively be referred to as the "**Parties**," and each individually as a "**Party**").

**WHEREAS,** Key and North Point wish to Commercialize the Products in the Territory;

**WHEREAS,** North Point possesses rights to the Products and the Dossiers in relation to such Products in the Territory;

**WHEREAS,** Key wishes to obtain from North Point, and North Point wishes to grant to Key, an exclusive license to manufacture or have manufactured, distribute, and sell the Products in the Territory, and a co-exclusive right with North Point to market and promote the Products in the Territory, pursuant to the terms and conditions of this Agreement;

**NOW, THEREFORE,** in consideration of the mutual promises, covenants and agreements hereinafter set forth, the sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties to this Agreement mutually agree as follows:

**Article 1     – DEFINITIONS**

For purposes of this Agreement, the following initially capitalized terms in this Agreement, whether used in the singular or plural, shall have the following meanings:

"**Affiliate**" of any Person means, at the time that such determination is being made, any other Person controlling, controlled by or under common control with such first Person, in each case whether directly, or indirectly through one or more intermediaries; for purposes of the foregoing, "**control**" (and any derivation thereof including the terms "**controlled by**" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or in any other manner.

"**API**" means the active pharmaceutical ingredient of a Product.



1



EXHIBIT W

Confidential

**"API Manufacturer"** means the company that manufactures and supplies to the API for each Product.

**"Asset Purchase Agreement"** means that certain Asset Purchase Agreement by and between North Point, Key, and Recordati, dated July 7th, 2022.

**"Business Day"** means a day other than a Saturday, Sunday, or any day on which a commercial banking institution in New York, New York is closed for business.

**"Change of Control"** means, with respect to a Party: (a) the sale of all or substantially all of such Party's assets or business relating to this Agreement; (b) a merger, reorganization or consolidation involving such Party in which the voting securities of such Party outstanding immediately prior thereto cease to represent at least fifty percent (50%) of the combined voting power of the surviving entity immediately after such merger, reorganization or consolidation; or (c) a person or entity, or group of persons or entities, acting in concert acquire more than fifty percent (50%) of the voting equity securities or management control of such Party.

**"Claim"** means any civil, criminal, administrative, arbitral or investigative demand, complaint, allegation, claim, action, cause of action, suit, investigation, order (whether judicial or administrative), proceeding or prosecution or any other claim or demand.

**"Commercialization"** means any and all activities directed to marketing, promoting, distributing, offering for sale and selling a Product. When used as a verb, **"Commercialize"** means to engage in Commercialization.

**"Commercialization Expenses"** means the sum of (a) Marketing Expenses, and (b) Other Expenses.

**"Commercially Reasonable Efforts"** means the efforts that a Person desirous of achieving a result would use in similar circumstances to achieve that result as expeditiously as reasonably practicable, which may include taking an action that will result in incurring fees and expenses, and in any event not less than the efforts that a person would reasonably devote to its own product of similar market potential, profit potential, or strategic value.

**"Confidential Information"** has the meaning given to it in Section 12.1.

**"Contract Manufacturer"** means any company who manufactures and/or packages each Product as approved in the applicable Dossier.

**"Contract Year"** means (a) with respect to the first Contract Year, the period beginning on the Effective Date and ending on December 31, 2022 (the **"First Contract Year"**), (b) with respect to each subsequent Contract Year, the one (1) year period beginning on the day following the end of the First Contract Year and each succeeding one (1) year period thereafter, and (c) with respect to the last Contract Year, the period beginning on January 1 of such last Contract Year and ending on the date as of which this Agreement expires or is terminated (the **"Last Contract Year"**). Each Contract Year (other than the First



2                          *RWS*

Confidential

Contract Year or the Last Contract Year) shall be divided into four (4) **"Contract Quarters"** comprised of successive three (3) month periods. In the First Contract Year, the first Contract Quarter shall end on the first day following the Effective Date that is the last day of a Contract Quarter, and in the Last Contract Year, the last Contract Quarter shall end upon expiration or termination of the Agreement.

**"Dossier"** means the documentation containing all of the information prepared for the purpose of obtaining Marketing Authorization for a Product with the Regulatory Authorities in the Territory to permit the marketing, promotion, distribution and sale of a Product in the Territory.

**"Effective Date"** means the execution date of the last of the representative of a Party to sign this Agreement as indicated on the signature page of this Agreement. If the representative of a Party signs the Agreement without indicating its execution date, the execution date of the representative of the other Party shall be deemed the Effective Date.

**"FDA"** means the United States Food and Drug Administration, or any successor agency thereto.

**"First Commercial Sale"** means the first commercial sale of a Product to a non-affiliated third party in the Territory.

**"GMP"** means the current good manufacturing practices of the FDA, as set forth in 21 C.F.R. Parts 210 and 211 and all applicable rules, regulations, guides and guidances in the Territory and in the country of manufacturing for the manufacture of pharmaceutical products, as same may be amended from time to time.

**"Gross Sales"** means, for the period in relation to which it is calculated, the total amounts invoiced for all sales of the Products any third party in the Territory, in a bona fide arms-length transaction (but not including sales between a Party and its Affiliates or sublicensees where such Product is intended for resale), before any deductions.

**"Indemnitee"** has the meaning given to it in Section 11.

**"Indemnitor"** has the meaning given to it in Section 11.

**"Indications"** means the indications for each Product approved by the FDA on the basis of the Regulatory Filing.

**"Infringement Claim"** has the meaning given to it in Section 8.4

**"Initial Term"** has the meaning given to it in Section 10.1.1.

**"Intellectual Property"** or **"IP"** shall mean all intangible legal rights, titles and interests, evidenced by or embodied in (i) all inventions, ideas, designs, concepts, techniques, discoveries, or improvements, regardless of patentability, made solely or jointly, and all patents (whether in the form of utility patents or design patents), provisional patent



3

*ews*

Confidential

applications, non-provisional patent applications (whether pending or not), and patent disclosures together with all reissuances, continuations, continuations in part, revisions, extensions, and re-examinations thereof; (ii) all trademarks, service marks, copyrights, designs, trade styles, logos, trade dress, and corporate names, including all goodwill associated therewith; (iii) any work of authorship, regardless of copyrightability, all compilations, all copyrights; (iv) all trade secrets and proprietary processes and formulas, licenses, approvals, government authorizations (including the Marketing Authorization)and know-how; and (v) all other proprietary rights and any other intellectual property rights of any kind ad nature however designated and however recognized.

**"Invention"** shall mean any modifications, revisions, alterations, enhancements, upgrades, or betterments, relating to each Product, which are conceived, created, devised, or acquired during the Term directly or indirectly by or on behalf of, or at the direction of, either Party.

**"Law"** means any applicable regional, federal, state, provincial and local laws, statutes, regulations, rules, guidelines, orders, and any other requirements of any government or regulatory authority applicable to the development, registration, manufacturing, testing, packaging, labeling, storing, import, export, shipping, marketing, offer for sale, and sale of pharmaceutical products or as otherwise applicable to the Parties' respective obligations under this Agreement.

**"Licensed Intellectual Property"** means any Intellectual Property Rights owned or licensable by North Point and used in the manufacture, development, promotion, sale, or commercialization of the Products in the Territory, including (i) the Product Trademarks, (ii) the Marketing Authorizations and Product Information for the Products, and (iii) any Inventions or other discoveries conceived or reduced to practice by North Point or Key or jointly by North Point and Key during the Term, whether patentable or not, relating to the Products.

**"Losses"** means any damages, liabilities, awards, penalties, fines, judgments, obligations, costs, expenses or losses, including, without limitation, reasonable legal fees and expenses, court costs, arbitration fees and amounts paid in settlement of Claims.

**"Marketing Authorization"** means an approval or authorization from the appropriate Regulatory Authorities as required to allow the promotion, marketing, distribution and sale the Products in the Territory, including the New Drug Applications for the Products.

4

Confidential

**"Marketing Expenses"** " means all documented out-of-pocket costs and expenses paid to Third Parties or accrued therefor for marketing services identified in an approved Marketing Plan including, without limitation, such costs and expenses associated with: (i) marketing, advertising, and promoting of a Product (including, without limitation, educational expenses, speakers' programs and symposia, and Promotional Materials); (ii) market research for the Product; (iii) training and communication materials for the Product; and (iv) promotional discounts (other than those accounted for in the calculation of Net Sales), including, without limitation, distribution incentives and all costs and escrow requirements with relation to patient copay assistance programs.  For the avoidance of doubt, Marketing Expenses shall not include any Sales Deductions or any payments of Transfer Price, and all Marketing Expenses must be defined and approved in advance by North Point as part of the Commercialization Budget pursuant to Section 4.7.

**"Net Sales"** means an amount equal to the total Gross Sales less the following deductions (the **"Sales Deductions"**), as calculated in accordance with U.S. generally accepted accounting principles (GAAP):

(a) trade, quantity and cash discounts or rebates actually allowed and taken;

(b) any adjustments on account of price adjustments, billing errors, rejected goods, damaged goods and returns;

(c) credits, volume rebates, charge-back and prime vendor rebates, fees, reimbursements or similar payments granted or given to wholesalers and other distributors, buying groups, health care insurance carriers, pharmacy benefit management companies, health maintenance organizations or other institutions or health care organizations;

(d) any tax, tariff, customs duty, excise or other duty or other governmental charge (other than a tax on income) levied on the sale, transportation or delivery of a Product and borne by the seller thereof;

(e) payments or rebates paid in connection with sales of a Product to any governmental or regulatory authority in respect of any state or federal Medicare, Medicaid or similar programs; and

(f) any invoiced charge for freight, insurance or other transportation costs charged to the customer.

All such deductions shall be supported by written documentation.

With respect to each calculation of Net Sales, the foregoing Sales Deductions shall only be deducted once and only to the extent not otherwise deducted from Gross Sales or included in the Transfer Price or Commercialization Expenses.

**"Net Profits"** means, for the period in relation to which it is calculated, an amount equal to Net Sales for such period *less* Transfer Price paid for units sold during such period *less* Commercialization Expenses incurred during such period.

**"Other Expenses"** means all documented out-of-pocket costs and expenses paid to Third Parties in accordance with the terms of this Agreement, subject to the conditions set forth

5

Confidential

in Schedule A hereto, including, without limitation, such costs and expenses associated with (i) warehousing and distribution costs, (ii) promotional discounts (other than those accounted for in the calculation of Net Sales), including, without limitation, distribution incentives and all costs and escrow requirements with relation to patient copay assistance programs, (iii) regulatory expenses, (iv) the processing and destroying of Product returns, (v) Product recalls not due to a manufacturing defect, and (vi) all reasonable and documented costs incurred by Key and approved by North Point in support of this agreement. For the avoidance of doubt, Other Expenses shall not include any Sales Deductions or any payments of Transfer Price and all Other Expenses must be defined and approved in advance by North Point as part of the Commercialization Budget pursuant to Section 4.7.

**"Person"** means any individual, corporation, partnership, association, joint-stock company, trust, unincorporated organization or government or political subdivision thereof.

**"Pharmacy Customer"** has the meaning given to it in Schedule A.

**"Pharmacovigilance Agreement"** has the meaning given to it in Section 7.1.

**"Product"** means the following pharmaceutical products, whether sold under the applicable Product Trademark or in unbranded, generic form, for human use:

- DESOXYN™ (methamphetamine hydrochloride) tablets, approved under NDA #005378, including all amendments and supplements thereto, and

- TRANXENE™ (clorazepate dipotassium) tablets, approved under NDA #017105, including all amendments and supplements thereto.

**"Product Information"** means all information relating to the Products and the API for each Product, as well as any additional tests and studies conducted, and any additional data and documentation developed at the request of the Regulatory Authorities in order to obtain the Marketing Authorization for the Product in the Territory.

**"Product Labeling"** means (a) the FDA full prescribing information for each Product, including any required patient information, and (b) all labels and other written, printed or graphic matter upon any container, wrapper or any package insert or outsert utilized with or for the Products, in all cases, as approved by the FDA.

**"Product Trademarks"** means DESOXYN™ and TRANXENE™.

**"Promotion"** means those detailing and other activities undertaken by a pharmaceutical company's sales forces to implement the plans and strategies with respect to a particular prescription pharmaceutical product under a single trademark. When used as a verb, **"Promote"** shall mean to engage in such activities.

6          *RWS*



Confidential

**"Promotional Materials"** means promotional, advertising, communication and educational materials and literature intended for use in the Territory relating to a Product prepared in compliance with all FDA rules and regulations as well as the Federal Food, Drug and Cosmetic Act for distribution in conjunction with the Commercialization of the Product in the Territory.

**"Quality Agreement"** has the meaning given to it in Section 6.1.

**"Recordati"** means Recordati Rare Diseases Inc. USA.

**"Regulatory Approval"** means the approval by the applicable federal, national, multinational, state, provincial or local regulatory agency, department, bureau or other governmental entity necessary for the promotion, marketing and commercial sale of a Product, including the Marketing Authorization for the Product.

**"Regulatory Authority"** means any applicable governmental or regulatory agency, authority, or body responsible for regulating the manufacture, labeling, storage, import, export, registration, promotion, marketing, distribution, sale, pricing and reimbursement of pharmaceutical products, including the FDA and any successor governmental regulatory health authority.

**"Regulatory Filing"** means all documentation relating to the filing for and procurement of the Marketing Authorization for each Product in the Territory.

**"Renewal Term"** has the meaning given to it in Section 10.1.2.

**"Royalty"** has the meaning given to it in item of Schedule A.

**"Specifications"** means the specifications for the manufacture, packaging, storage, release, labeling, and shipping of the Product, which specifications shall conform to the specifications set forth in this Agreement, the Quality Agreement and the Marketing Authorization for the Product.

**"Term"** means the Initial Term together with all Renewal Terms, as applicable.

**"Territory"** means United States of America.

**"Third-Party Distributor"** has the meaning given to it in Section 2.2.1.

**"Transfer Price"** means, for each Product (i) the price paid to the Contract Manufacturer by Key for each unit of finished Product, plus (ii) the price paid by Key to the API Manufacturer for the API included in each unit of finished Product.

**Article 2**      **– COMMERCIALIZATION RIGHTS AND LICENSE**

2.1      *License / Commercialization Rights.*

7

Confidential

2.2     Subject to the terms and conditions of this Agreement, during the Term of this Agreement, North Point grants to Key an exclusive, non-transferable and non-assignable license, without the right to grant sublicenses except to its Affiliates and to approved Third-Party Distributors, to the Licensed Intellectual Property to manufacture, have manufactured, distribute, import, and sell the Products in the Territory in accordance with the terms of this Agreement.

2.3     Subject to the terms and conditions of this Agreement, during the Term of this Agreement, North Point grants to Key a co-exclusive (along with North Point), non-transferable and non-assignable license, without the right to grant sublicenses except to its Affiliates and to approved Third-Party Distributors, to the Licensed Intellectual Property to Promote the Products in the Territory in accordance with the terms of this Agreement.

2.4     *Third-Party Distributors.*

2.5     Key shall notify North Point, and North Point shall notify Key, of any of its Affiliates Commercializing or Promoting Products in the Territory. Each Party may also use local Persons that are not its Affiliates (each, a "**Third-Party Distributor**") to Commercialize or Promote the Products in the Territory, so long as each such Third-Party Distributor is approved in advance by the other Party in writing and any written agreement with such Third-Party Distributor that shall be consistent with the applicable terms and conditions of this Agreement and shall in no event include terms less stringent than those in this Agreement. Key shall ensure that any such agreement is assignable by Key to North Point or a designee of North Point upon request and may be terminated by Key upon the termination of this Agreement for any reason. The contracting Party shall be responsible for ensuring that each of its Affiliates and Third-Party Distributors complies with the terms and conditions of this Agreement, and such Party shall at all times remain liable for its Affiliates' and Third-Party Distributors' compliance with the terms of this Agreement.

2.6     *Additional Restrictions.* Key shall not directly, or indirectly:

2.6.1     use the Dossier or Product Information for any purpose expect to perform its obligations hereunder; or

2.6.2     offer for sale, sell, or supply, or allow its Affiliates or Third-Party Distributors to offer for sale, sell, or supply the Products to customers located outside of the Territory or to Third Parties that Key knows or reasonably should know will sell the Products outside the Territory.

2.7     **Exclusive Purchases.** During the Term, Key shall buy all Product for sale in the Territory exclusively from the mutually agreed Contract Manufacturers, with the understanding that North Point will fully reimburse Key for the Transfer Price for all Product purchased by Key in accordance with the terms of this Agreement within ten (10) business days following receipt by North Point of a copy of the invoice received by Key from the Contract Manufacturer. All purchase orders for Product will be approved by North Point in advance of such purchase orders being submitted to the Contract Manufacturer.



8                    RWS

Confidential

2.8    **Exclusivity.** During the Term, neither Party nor their respective Affiliates shall, directly or indirectly, manufacture, purchase or otherwise acquire for distribution or sale in the Territory, or market, promote, offer for sale, sell, or distribute in the Territory, any other pharmaceutical product with the same API, strength, and dosage form as that of the Products in this Agreement.

**Article 3    MARKETING AUTHORIZATION**

3.1    *Ownership of Marketing Authorization*

3.1.1    The Parties acknowledge and agree that North Point has purchased all right, title, and interest in and to the Marketing Authorization for each Product and the other Licensed Intellectual Property from Recordati pursuant to the Asset Purchase Agreement. For ease of administration, the Parties have agreed that Key shall hold the Marketing Authorization for each Product in Key's name during the Term of this Agreement. Nevertheless, North Point shall own all beneficial interest in each Marketing Authorization throughout the Term.

3.1.2    Key shall not transfer any right or interest in or to the Marketing Authorization except that Key may transfer all right, title, and interest in and to the Marketing Authorization to North Point or its designee upon termination of this Agreement in accordance with the terms hereof. Key shall not grant any security interest or lien in the Marketing Authorizations for the Products and shall not otherwise create any encumbrance of any kind in or to the Marketing Authorizations for the Products without written consent from North Point.

**Article 4    JOINT COMMITTEE**

4.1    **Purpose; Formation.** The Parties hereby establish a Joint Committee (the "**Joint Committee**") that will monitor and oversee the Commercialization of the Products in the Territory and any collaborative activities of the Parties under this Agreement and that will facilitate communications between the Parties with respect to such activities and will otherwise have the responsibilities set forth in Section 7.3 below.

4.2    **Composition.** Each Party shall initially appoint one (1) representative to the Joint Committee, each of whom shall have sufficient seniority within the applicable Party to make decisions arising within the scope of the Joint Committee's responsibilities. Each Party shall designate their initial representative to the Joint Committee within ten (10) Business Days following the Effective Date. The Joint Committee may change its size from time to time by mutual consent of its members; provided, however, that the Joint Committee shall at all times consist of an equal number of representatives of each of North Point and Key. Each Party may replace its Joint Committee representatives at any time upon written notice to the other Party. The Joint Committee may invite non-members (including consultants and advisors of a Party who are under an obligation of confidentiality consistent with this Agreement) to participate in the discussions and meetings of the Joint Committee, provided that such participants shall have no voting authority at the Joint Committee. The Joint Committee shall have two (1) chairpersons,



9

*RWS*

Confidential

one from each of North Point and Key. The role of the chairperson shall be to convene and preside over meetings of the Joint Committee.

4.3 **Specific Responsibilities**. In addition to its overall responsibility for monitoring and providing a forum to discuss and coordinate the Parties' activities and responsibilities under this Agreement, the Joint Committee shall in particular:

(a) provide a forum for consensual decision making in the net-best-interest for both Key and North Point;

(b) coordinate the transition of Products from RRD, including the transition plan, the management of any inventory and concomitant accounting approach;

(c) coordinate overall strategy for the Commercialization efforts described in this Agreement;

(d) undertake a quarterly review and comparison of the status of each Product's Commercialization plans, including, without limitation the applicable timelines, and provide direction to the conduct of each Commercialization program, as necessary;

(e) provide a forum to discuss and coordinate the Promotion of the Product, including review and approval of Promotional strategy and promotional materials;

(f) prepare production forecasts for the Products;

(g) discuss sales performance and metrics;

(h) determine floor pricing for each Product;

(i) discuss the Marketing Plans and the Commercialization Budget;

(j) review and discuss draft regulatory filings to be filed by Key and discuss communications to be made by Key with Regulatory Authorities related to or required for the Products in the Territory, including in connection with the receipt of any regulatory notices; and

(k) perform such other functions as appropriate to further the purposes of this Agreement as allocated to it in writing by the Parties or as specified in the Agreement.

4.4 *Meetings*. The Parties shall endeavor to have their first meeting of the Joint Committee within thirty (30) days after the Effective Date. The Joint Committee shall meet at least one (1) time per Calendar Quarter during the Term spaced at regular intervals unless the Parties mutually agree in writing to a different frequency for such meetings. Either Party may also call a special meeting of the Joint Committee (by videoconference or teleconference) by providing at least ten (10) Business Days' prior written notice to the other Party in the event such Party reasonably believes that a significant matter must be addressed prior to the next scheduled meeting, and such Party shall provide the Joint



10

*RWS*

Confidential

Committee no later than five (5) Business Days prior to the special meeting with materials reasonably adequate to enable an informed decision. No later than ten (10) Business Days prior to any regularly scheduled meeting of the Joint Committee, the chairpersons of the Joint Committee shall prepare and circulate an agenda for such meeting; provided, however, that either Party may propose additional topics to be included on such agenda, either prior to or in the course of such meeting. The Joint Committee may meet in person, by videoconference or by teleconference. Each Party will bear the expense of its respective Joint Committee members' participation in Joint Committee meetings. Meetings of the Joint Committee shall be effective only if at least one (1) Joint Committee representative of each Party is present or participating in such meeting. The Joint Committee Chairpersons will be responsible for preparing reasonably detailed written minutes of all Joint Committee meetings that reflect, without limitation, decisions made at such meetings. The Chairpersons shall send draft meeting minutes, including a description of all discussions and decisions, to each member of the Joint Committee for review and approval within ten (10) Business Days after each Joint Committee meeting. Such minutes will be deemed approved unless one (1) or more members of the Joint Committee object to the accuracy of such minutes within ten (10) Business Days of receipt.

4.5        *Decision-Making*. In addition to resolving issues specifically delegated to it, the Joint Committee shall have the authority to resolve any disputes not resolved by any Subcommittee or as designated in this Agreement. The representatives from each Party will have, collectively, one (1) vote on behalf of that Party on the Joint Committee, and all decision-making shall be by consensus. If the Joint Committee is unable to reach consensus on any issue for which it is responsible within five (5) Business Days after good faith attempts to resolve the issue have failed, the Joint Committee shall refer such dispute to the Executive Officers of the Parties. If the Executive Officers cannot resolve the dispute within ten (10) Business Days from the initiation of discussions, then the Parties will consider dispute resolution proceedings.

4.6    *Joint Committee Authority*. The Joint Committee shall have solely the powers expressly assigned to it in Section 3.3 and 3.5 and elsewhere in this Agreement, and shall not have any power to amend, modify, or waive compliance with this Agreement. *Subcommittees*. From time to time, the Joint Committee may establish joint subcommittees to oversee particular projects or activities, as it deems necessary or advisable (each, a "**Subcommittee.**")

4.7    *Commercialization Budget*. At least fifteen (15) calendar days prior to the beginning of each calendar quarter during the Term, each of Key and North Point shall deliver to the Joint Committee a budget for all Commercialization Expenses for each Product that reflects a good faith estimate and itemization of the Commercialization Expenses to be incurred by such Party for the Commercialization Activities to be performed by such Party in accordance with the terms of this Agreement (including Schedule A) with respect to the applicable Product in the upcoming calendar quarter, broken down by month (the "**Commercialization Budget**"). The Joint Committee will review and provide comments on such Commercialization Budget. North Point will have final approval for the Commercialization Budget. The Parties will manage the actual



11

*aus*

Confidential

Commercialization Expenses in each quarter so as not to exceed the approved Commercialization Budget by more than five percent (5%). Within fifteen (15) calendar days following the end of each calendar month during the Term, Key and North Point shall each deliver a statement to the other showing the expenses actually incurred by each of Key and North Point during the calendar month just ended with respect to each Product (each, an "**Expense Statement**"). Upon receipt and review of such statement, North Point will reimburse Key for all approved expenses up to the budgeted amount for such expenses plus five percent.

4.8     *Marketing Plans.*

4.8.1     **General.** The Joint Committee shall develop and be responsible for implementing a marketing plan for each Product (each, a "**Marketing Plan**"). The Marketing Plan shall define the goals and objectives for Commercializing the Products in the Territory in the pertinent year, and shall be consistent with the then-current Commercialization Budget.

4.8.2     **Initial Marketing Plans.** The initial Marketing Plans are attached to this Agreement as Schedule 4.8.2 (the "**Initial Marketing Plans**"). The Initial Marketing Plan shall include the minimum detail requirements, which requirements will be consistent with the approved Commercialization Budget, and minimum Commercialization Expenses as designated and approved by the Joint Committee, provided that North Point will have final say over the budget for Commercialization Expenses.

4.8.3     **Updated Marketing Plans.** As early as necessary in each Contract Year beginning with the first full Contract Year after the Effective Date, the Joint Committee shall amend and update the Marketing Plan for each Product for the following three (3) Contract Years no later than [October 31] of such year.

4.8.4     **Contents of Each Marketing Plan.** Each Marketing Plan shall encompass at least three (3) Contract Years and shall contain at a minimum:

(a)     Market research and strategy (including market and competitive analysis, sales trends, product positioning and other matters);

(b)     Advertising and promotion programs, strategies (including development of materials, media plans, use of symposia, academic speakers and other matters), and forecasted minimum spend levels of each actionable (which minimum spend will be in North Point's sole discretion);

(c)     Sales plans and activity;

(d)     Determination of the target audiences for each indication of the Products; and

(e)     Identification of the total details required to support the Products during such Contract Year.

12

Confidential

## Article 5    REGULATORY MATTERS; MARKETING AUTHORIZATION,

5.1    **Permits and Licenses.** During the Term, Key shall obtain and maintain all licenses, permits, orders, authorizations and consents necessary or required by government authorities, including the Regulatory Authorities in the Territory, to perform its obligations under this Agreement, to conduct its operations and business in the manner contemplated under this Agreement and to distribute and sell the Products in the Territory.

5.2    **Marketing Authorizations.** During the Term, Key shall maintain the Marketing Authorizations and Dossier in full force and effect in compliance with applicable Law. Key shall be responsible for any required reporting or submissions to FDA and for handling and responding to any FDA communications or inspections with respect to the Products, and all reasonable and documented out of pocket expenses incurred by Key and approved by North Point for the foregoing will be reimbursed by North Point as Commercialization Expenses in accordance with the terms hereof. Key shall promptly provide North Point with a copy of any correspondence (including a written summary of any oral communications) from or to a Regulatory Authority relating to the Products, Marketing Authorizations or Dossier, including, by way of example, with respect to any action being considered or taken by such Regulatory Authority. For clarity, Key shall notify North Point upon receiving any notices from Regulatory Authorities of: (i) any non-compliance in relation to the Products or its facilities or those of its Affiliates or Third-Party Distributors or the Contract Manufacturer or API Manufacturer, as applicable; or (ii) any inspections in relation to its facilities or its facilities or those of its Affiliates or Third-Party Distributors or the Contract Manufacturer or API Manufacturer, as applicable, including providing North Point with any issued by the Regulatory Authorities in respect of such inspections. For any response, communication reports, or submission by Key to a Regulatory Authority related to the Products, Key shall provide a draft to North Point and consider in good faith any comments provided by North Point reasonably in advance of any regulatory submission deadline.

5.3    **Regulatory Matters.** In accordance with any decisions made by the Joint Committee and as required by applicable Law, Key shall obtain, maintain and seek revisions of the Marketing Authorizations for each Product, including, without limitation, Regulatory Approvals for any label, labeling, package inserts, packaging or Promotional Materials used in connection with the Product, and all reasonable and documented out of pocket expenses incurred by Key and approved by North Point for such activities will be reimbursed by North Point as Commercialization Expenses in accordance with the terms hereof.

5.4    **Variations.** With respect to change, variation, or modification to the Marketing Authorization (a "**Variation**"), all such Variations shall be discussed by the Parties through the Joint Committee. For any Variation that is mandated by a Regulatory Authority or required by applicable Law, and any Variation that the Parties mutually agree upon, Key shall make all necessary submissions to implement such Variation and the direct cost or expenses necessary to make any such Variation shall be included in Commercialization Expenses.

13

Confidential

5.5   **Records.** The Parties agree throughout the Term to maintain records and otherwise establish procedures to assure compliance with all regulatory, professional and other legal requirements which apply to the Commercialization of the Products.  For clarity, Key shall keep complete and accurate written records of regulatory activities associated with or regarding Products, Marketing Authorizations or Dossier. Further to the above, all such applicable records shall be maintained by Key for the period required by applicable Law or a period of three (3) years post termination or expiration of this Agreement, whichever is longer. All reasonable and documented out of pocket expenses incurred by Key and approved by North Point for such activities will be reimbursed by North Point as Commercialization Expenses in accordance with the terms hereof.

**Article 6      MANUFACTURE AND SUPPLY**

6.1   **Manufacture of Products.**

6.1.1   Key shall be responsible for engaging a Contract Manufacturer to manufacture and supply the Products for Commercialization in the Territory and shall engage the API Manufacturer(s) to supply API for each Product. Key shall enter into a written agreement with the Contract Manufacturer for the manufacture and supply of the Products hereunder and shall ensure that any such agreement is assignable by Key to North Point or a designee of North Point upon the termination of this Agreement. All reasonable and documented out of pocket expenses incurred by Key and approved by North Point for these activities will be reimbursed by North Point as Commercialization Expenses in accordance with the terms hereof.

6.1.2   Key shall enter into a written agreement(s) with the API Manufacturer(s) for the manufacture and supply of the API hereunder and shall ensure that any such agreement is assignable by Key to North Point or a designee of North Point upon the termination of this Agreement.

6.1.3   Copies of the agreements with the Contract Manufacturer and API Manufacturer(s) will be delivered to North Point following execution.

6.2   **Compliance.** Key shall and shall cause its Affiliates, the Contract Manufacturer, and any Third-Party Distributor, as applicable, to manufacture, fill, test, label, package, store, ship, supply, dispose and handle the Products and the API and otherwise comply with its obligations under this Agreement in compliance with all applicable GMPs and applicable Laws in the Territory and in the country of manufacture.

6.3   **Packaging and Labeling.** Key shall be responsible for the packaging and Labeling of the Products in accordance with the applicable Laws in the Territory. Key shall label all Products using Key's labeler code and NDC number of its designation. All reasonable and documented out of pocket expenses incurred by Key and approved by North Point for these



*RWS*

Confidential

activities will be reimbursed by North Point as Commercialization Expenses in accordance with the terms hereof.

6.4     **Returns of Products to North Point.** If any Products are returned to North Point, North Point shall, at Key's option, either destroy or ship such Products to a facility designated by Key. The reasonable and document out of pocket costs of any such shipment or destruction that are not recoverable from the Contract Manufacturer pursuant to the terms of the contract manufacturing agreement shall be included as a Marketing Expense and shall be reimbursed by North Point in accordance with the terms hereof.

6.5     **Discontinuance of Sales.** Either Party, at any time, shall be entitled to cease, permanently or temporarily, the sale of any Product in the Territory if continued sale of such Product in the Territory would be in violation of any Law, or, with reasonable prior consultation with the other Party, if such Party, in good faith, believes that it has an ethically valid reason based on medical or scientific concerns relating to such Product. Prior to any such discontinuation, the Parties shall discuss any safety or ethical concerns through the Joint Committee and consider options for resolving such issues without discontinuing sales of the Product.

6.6     **Recalls Or Other Corrective Action.**

6.6.1     **With Respect to Product.**   Key shall promptly provide North Point any information obtained by it suggesting that a recall, field alert, product withdrawal, or other field action relating to a Product (a "**Product Action**") is or may be necessary. Further, Key shall cooperate with all reasonable requests from North Point to obtain additional information that may bear upon whether to initiate a Product Action. Unless a Product Action is recommended by a Regulatory Authority, the final decision regarding whether to initiate a Product shall be made by North Point in good faith.

6.6.2     **Notice.** Each Party shall, as soon as practicable, notify the other Party of any recall information received by it in sufficient detail to allow the Parties to comply with any and all applicable Laws.

6.6.3     **Costs and Expenses of Recalls.** Any documented, direct, costs incurred (i.e., paid or accrued) by a Party with respect to participating in such recall, market withdrawal or other corrective action in the Territory shall be deemed a Marketing Expense; provided, however, that if such recall, market withdrawal or other corrective action was caused by a Party's negligence, willful misconduct or breach of this Agreement occurring while the Product was under such Party's or its distributors or manufacturers' control (e.g., mishandling or adulteration of the Product in such Party's or its distributor's or manufacturers' warehouse), such costs shall not be deemed a Marketing Expense.

6.7     **Events Affecting Integrity or Reputation.** During the Term, the Parties shall notify each other immediately of any circumstances of which they are aware and which could impair the integrity and reputation of the Products or if a Party is threatened by the unlawful activity of any Third Party in relation to the Products, which circumstances shall include, by way of illustration, deliberate tampering with or contamination of the Products

Confidential

by any Third Party as a means of extorting payment from the Parties or another Third Party. In any such circumstances, the Parties shall use Commercially Reasonable Efforts to limit any damage to the Parties and/or to the Products. The Parties shall promptly call a Joint Committee meeting to discuss and resolve such circumstances.

6.8  **Exchange of Drug Safety Information; Adverse Reaction Reporting.** Within ninety (90) days after the Effective Date, the Parties shall enter into the Pharmacovigilance Agreement. The Pharmacovigilance Agreement shall require that Key perform all pharmacovigilance activities (including the collection and reporting of quality complaints, adverse events and safety data related to the Products in the Territory to applicable Regulatory Authorities) consistent with applicable Law and industry standards therefor. Each Party hereby agrees to comply with its respective obligations under such Pharmacovigilance Agreement and to cause its Affiliates and sublicensees to comply with such obligations.

## Article 7

## DISTRIBUTION AND PROMOTION

7.1  **Objectives for Commercialization of Products.** The Parties agree that the principal objective of the Parties in jointly Promoting and Commercializing the Products is to use Commercially Reasonable Efforts to exploit the full commercial value of the Products in the Territory.

7.2  **Commercially Reasonable Efforts in the Commercialization of the Products.** Key and North Point shall Commercialize and Promote the Products in the Territory in accordance with the Commercialization activities allocated to each Party pursuant to the applicable Marketing Plan, in order to optimize the sales of the Products in the Territory. No Party shall be required to undertake any activity under this Agreement which it believes, in good faith, may violate any applicable Laws.

7.3  **Control of Orders.** Key shall: (i) receive, accept, and fill orders for Product in the Territory (including distribution of Product); and (ii) control invoicing, order processing and collection of accounts receivable for sales of Product in the Territory.

7.4  **Misdirected Orders.** If, for any reason, North Point receives orders for Product, North Point shall forward such orders to Key (or if directed by Key to Key's wholesalers) as soon as practicable.

7.5  **First Commercial Sale.** The Parties acknowledge that Recordati will sell Desoxyn inventory in the Territory for up to a maximum of one-hundred-and-twenty-day transition period following the closing of the Recordati transaction. Any inventory of Desoxyn will be transferred by Recordati to Key following such transition period, and Key will arrange to have such inventory relabeled with Key's labeling and NDC. No inventory of Tranxene will be transferred by Recordati to Key. Key will not engage the First Commercial Sale of a Product in the Territory without North Point's prior authorization. Key shall ensure that the First Commercial Sale of Desoxyn in the Territory occurs within fifteen (15) days



16

*ews*

Confidential

following the latter of (i) transfer of ownership of the Marketing Authorization to Key, (ii) receipt of the initial inventory of the Product from Recordati, and (iii) written authorization from North Point. Key will use Commercially Reasonable Efforts to acquire inventory of Tranxene and engage in the First Commercial Sale of Tranxene as soon as possible following the Effective Date. All reasonable and documented out of pocket expenses incurred by Key and approved by North Point for these activities will be reimbursed by North Point as Commercialization Expenses in accordance with the terms hereof.

7.6     **Content, Quantity and Distribution of Promotional Materials.**   The determination of the content, the quantity and method of distribution of the Promotional Materials shall, in accordance with the applicable Marketing Plan, be the responsibility of the Joint Committee, provided that Key shall ensure that all Promotional Materials comply with applicable Law and all Promotional Materials and promotional activities for Product shall be subject to the final written approval by Key. All reasonable and documented out of pocket expenses incurred by Key and approved by North Point for these activities will be reimbursed by North Point as Commercialization Expenses in accordance with the terms hereof.

7.7     **Use of Promotional Materials.**   The Parties will only utilize Promotional Materials, without revision, and only conduct Commercialization activities for the Products which, in each case, have been approved by the Joint Committee. Neither Party will add, delete or modify claims of efficacy and safety in the Promotion of the Products.

7.8     **Reports.** Within thirty (30) days following the end of each month, each of Key and North Point shall provide the Joint Committee with a report setting forth, in such detail and form as the Joint Committee shall require, the Promotional activities engaged in by each of Key and North Point for each Product in the Territory during such month.

7.9     **Records and Audits Pertaining to Promotion.** Both Parties shall keep accurate and complete records, consistent with internal standards as of the date hereof, of all Promotional activities carried out by it under this Agreement and shall make such records available for inspection, review and audit for the purpose of verifying the Promotional activities engaged in by such Party. All costs and expenses incurred in connection with performing any such audit shall be paid by the Party performing such audit.

7.10    **Compliance with Law.** Each Party will comply with applicable Law with respect to any and all Promotional activities engaged in with respect to any Product. Key will ensure that all of its Promotional Materials comply with applicable Law. Key will be solely responsible for fulfilling regulatory requirements pertaining to the Promotional Materials, including providing such Promotional Materials to the FDA where required by applicable Law prior to first use.

7.11    **Written Procedures.** In order to facilitate compliance with the Parties' regulatory obligations and commitments, the Parties agree to jointly develop written procedures for the surveillance, receipt, evaluation and reporting of inquiries, complaints and, if required,

17

Confidential

adverse drug experiences, relating to the Products, in accordance with applicable Laws and in consultation with the Joint Committee.

7.12     **Government Price Reporting**. Key shall be responsible for all governmental price reporting for all Products sold hereunder.

## Article 8     FINANCIAL PROVISIONS

8.1     **Booking of Sales**. Key shall be the Party responsible for the booking of sales of Product in the Territory.

8.2     **Commercialization Expenses**. North Point shall be responsible for one hundred percent (100%) of all approved Commercialization Expenses incurred by both North Point and Key in accordance with the Terms of this Agreement, including Schedule A.

8.3     **Profit Share**. For each Product, the Parties shall divide the Profit in accordance with Schedule A. Key shall pay North Point's Profit Share to North Point in accordance with the provisions set forth in Schedule A.

## Article 9     REPRESENTATIONS, WARRANTIES AND COVENANTS

9.1     *Mutual Representations, Warranties and Covenants*. Each Party represents, warrants and covenants to the other Party as follows, which representations and warranties shall be true as of the date hereof and throughout the Term of this Agreement:

9.1.1     it has full corporate power and authority and has taken all corporate action necessary to enter into and perform its obligations under this Agreement;

9.1.2     this Agreement constitutes a valid and binding obligation of it, enforceable against it in accordance with its terms;

9.1.3     no contracts, commitments or agreements of any nature exist, and none will be entered into during the Term of the Agreement, that impair or inhibit its ability to perform its obligations hereunder;

9.1.4     no judgment, decree, order or award of any board, tribunal, court, governmental body, including any Regulatory Authority or arbitrator having jurisdiction over it exists that impairs or inhibits its ability to perform its obligations hereunder;

9.1.5     it and its Affiliates, and each of their respective employees or representatives involved in its performance under this Agreement have not been the subject of debarment proceedings by any Regulatory Authority in the Territory and are not debarred, suspended or otherwise excluded by any government agency from receiving government contracts in the Territory or debarred under the applicable provisions of the Food, Drug, and Cosmetic Act;

18

Confidential

9.1.6    in the event that during the Term, such Party (i) becomes debarred, suspended, excluded, sanctioned, or otherwise declared ineligible by any Regulatory Authority in the Territory; or (ii) receives notice of an action or threat of an action with respect to any such debarment, suspension, exclusion, sanction or ineligibility by any Regulatory Authority in the Territory, such Party shall promptly notify the other Party;

9.1.7    it shall comply with applicable Law relating to such Party's rights, duties, responsibilities and obligations set forth in this Agreement; and

9.1.8    no one acting on its behalf will violate anti-bribery and anti-corruption laws to which it is subject, including to give, offer, agree or promise to give, or authorize the giving directly or indirectly, of any money or other thing of value to anyone as an inducement or reward for favourable action or forbearance from action or the exercise of influence (a) to any governmental official or employee (including employees of government-owned and government-controlled corporations or agencies), (b) to any political party, official of a political party, or candidate, (c) to an intermediary for payment to any of the foregoing, or (d) to any other person or entity in a corrupt or improper effort to obtain or retain business or any commercial advantage, such as receiving a permit or license.

9.2    *North Point General Representations, Warranties and Covenants*. North Point represents, warrants and covenants to Key as follows:

9.2.1    Organization. North Point is a corporation organized and existing under the laws of Wyoming;

9.2.2    Rights. North Point has the right to grant Key the license rights granted to it pursuant to Section 2.1; and

9.3    *Key General Representations, Warranties and Covenants*. Key represents, warrants and covenants to North Point as follows:

9.3.1    Organization. Key is a corporation organized and existing under the laws of Delaware.

9.4    *Disclaimer*. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES PROVIDED IN THIS AGREEMENT, THE PARTIES MAKE NO OTHER REPRESENTATIONS OR WARRANTIES TO EACH OTHER, EXPRESS OR IMPLIED, INCLUDING THOSE WITH RESPECT TO THE PRODUCT, WHETHER STATUTORY OR OTHERWISE, AND EACH PARTY SPECIFICALLY DISCLAIMS ALL OTHER WARRANTIES, INCLUDING, WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

9.5    *Notification*. Each Party will notify the other Party as promptly as practicable should any of its undertakings, representations and warranties under this Agreement become inaccurate or no longer true.

19

Confidential

## Article 10   - TERM AND TERMINATION

10.1   **Term.**

10.1.1   This Agreement shall begin on the Effective Date and, unless terminated earlier in accordance with the terms of this Agreement, shall continue for a period of ten (10) years from the First Commercial Sale in the Territory (the "**Initial Term**").

10.1.2   Unless terminated earlier in accordance with the terms herein, the Agreement shall automatically renew for successive three (3) year terms unless a Party delivers a written notice of non-renewal to the other Party at least six (6) months prior to the end of the then-current Term (the "**Renewal Term**").

10.2   **Termination.** The Parties shall have the following termination rights:

10.2.1   Material Breach. Each Party shall have the right to terminate this Agreement upon written notice to the other Party if such other Party has materially breached this Agreement and, after receiving written notice from the non-breaching Party identifying such material breach in reasonable detail, the other Party has (a) failed to cure such material breach within ninety (90) calendar days from the date of such notice, or (b) failed to pay an Uncured Late Payment within the twenty (20) calendar day time period provided for below. Any failure to pay any undisputed amount owed hereunder shall be deemed, and is hereby agreed by the Parties to be, a material breach of this Agreement if it remains unpaid for a period longer than twenty (20) calendar days after notice of non-payment has been provided (an "**Uncured Late Payment**").

10.2.2   Insolvency Event. Each Party shall have the right to terminate this Agreement upon the filing or institution of any bankruptcy, reorganization, liquidation or receivership proceedings by the other Party, or upon the failure by such Party for more than ninety (90) days to discharge or obtain the dismissal of any such actions filed against it or if the other Party makes any arrangement for the benefit of creditors or has a receiver, administrative receiver, liquidator, or administrator appointed over all or any part of its assets or business. Such termination shall be effective upon receipt of notice from the Party not involved in such event.

10.2.3   No-Cause. Either party shall have the right to terminate the Agreement in its entirety or with respect to either Product with written notice to the other party; the party wishing to absolve the Agreement must give a one hundred eighty (180) day notification of Agreement dissolution to allow for sufficient time for follow-on actions to unwind all transactional affairs involving the Agreement.

10.3   Effects of Termination. If this Agreement expires or is terminated in accordance with the terms and conditions of this Agreement (in its entirety or with respect to either Product), then:



*RWS*

Confidential

10.3.1  Neither Party shall have any rights in relation to the Confidential Information and Intellectual Property of the other Party with respect to the Product or Products (as applicable);

10.3.2  Each Party shall return to the other Party or destroy all of the other Party's Confidential Information and copies thereof (whatever the format); provided, however, that, the receiving Party (i) shall have no obligation to retrieve and destroy Confidential Information stored and *retained* on its or any of its representatives' back-up data storage systems and tapes as part of their respective ordinary course procedures or as required by applicable Laws, and (ii) may retain copy of Confidential Information for archival or compliance purposes, for so long as required and subject to the confidentiality obligations herein. The return of Confidential Information shall not affect the obligation of the receiving Party to maintain the confidentiality thereof in accordance with this Agreement;

10.3.3  Key acknowledges and agrees that upon any termination or expiration of this Agreement, all right title and interest in the Marketing Authorizations shall belong solely to North Point. Within three (3) business days following the effective date of any termination or expiration of this Agreement (in its entirety or with respect to either Product), or within such later timeframe as approved by North Point in writing, Key will make any submissions required by the FDA to transfer the Marketing Authorization(s) to North Point (or its designee). Key hereby designates and appoints North Point as attorney-in-fact of Key with authority to take the following actions following such three (3) business day period after termination or expiration of this Agreement (or such later period as approved by North Point): to execute and deliver all instruments and documents as North Point may determine necessary in order to transfer the Marketing Authorizations from Key to North Point, including executing, delivering, and submitting all documents and submissions required by the FDA to be submitted to effectuate the transfer of ownership of the Marketing Authorizations from Key to North Point.

10.3.4  In addition, promptly following effective date of any termination or expiration of this Agreement (in its entirety or with respect to either Product), the Parties will negotiate in good faith and agree upon (in each Party's reasonable discretion) a transition plan to coordinate the transfer of the Commercialization and regulatory activities with respect to the Product(s) from Key to North Point (or a designee of North Point) as soon as practicable but in any event within one hundred and eighty (180) days following the effective date of any termination or sixty (60) days following the expiration of this Agreement (in its entirety or with respect to either Product), including:

(a)     Key will transfer all regulatory documentation with respect to the Product(s) to North Point.

(b)     Key shall wind down all Commercialization of the Products in accordance with the Transition Plan.

21

Confidential

(c)    Key shall assign to North Point or its designee (or, in North Point's discretion, terminate) each agreement with each Third-Party Distributor and/or the Contract Manufacturer and/or the API Manufacturer(s).

(d)    Key shall continue to sell the Product(s) in its inventory (and remit the Profit Share in accordance with the terms hereof) and/or North Point shall purchase any and all inventory of the Products (as the case may be) held by Key (or its Affiliates or Third-Party Distributors) that is in useable and saleable condition at a price equal to the Transfer Price paid by Key for such inventory in accordance with the Transition Plan.

10.3.5  Expiration of the Term or termination of this Agreement (including on a Product-by-Product basis) for any reason shall be without prejudice to a Party's right to receive all payments due and payable from the other Party as of the effective date of such termination, if any, pursuant to the terms of this Agreement, and any other legal, equitable, or administrative remedies as to which a Party is or may become entitled. Any Commercialization Expenses owed to Key in accordance with the terms of this Agreement will be reimbursed by North Point, and Key shall remit North Point share of Net Profits to North Point.

10.4    **Survival**.  In addition to specific indications throughout this Agreement that Articles and Sections of this Agreement shall survive expiration and termination of this Agreement, Sections,  and any other provisions necessary and proper to give effect to the intention of the Parties as to the effect of the Agreement after termination shall survive any expiration or termination of this Agreement.  The expiration or termination of this Agreement shall not relieve any Party from any obligations which accrued prior to such expiration or termination and shall not destroy or diminish the binding force and effect of any of the terms and conditions of this Agreement that expressly or by implication come into or continue in effect on or after termination or expiration of this Agreement.

**Article 11    – INDEMNIFICATION, INSURANCE AND LIMITATION OF LIABILITY**

11.1    **Indemnification by North Point**.  Subject to Sections 11.2, North Point shall defend, indemnify and hold harmless Key and its Affiliates and each of their officers, directors, shareholders, employees, successors and assigns from and against all Claims of Third Parties, and all associated Losses, to the extent arising out of (a) North Point's negligence or willful misconduct in performing any of its obligations under this Agreement, and (b) a breach by North Point of any of its representations, warranties, covenants or agreements under this Agreement; provided, however, that in all cases referred to in this Section 11.1, North Point shall not be liable to indemnify Key for any Losses of Key to the extent that such Losses of Key were caused by: (x) the negligence or willful misconduct or wrongdoing of Key or (y) any breach by Key of its representations, warranties, covenants or agreements hereunder.

11.2    **Indemnification by Key**.  Subject to Sections 11.1, Key shall defend, indemnify and hold harmless North Point and its Affiliates and each of their officers, directors,



22                    ℛωS

Confidential

shareholders, employees, successors and assigns from and against all Claims of Third Parties, and all associated Losses, to the extent arising out of (a) Key's negligence or willful misconduct in performing any of its obligations under this Agreement and (b) a breach by Key of any of its representations, warranties, covenants or agreements under this Agreement; provided, however, that in all cases referred to in this Section 11.2, Key shall not be liable to indemnify North Point for any Losses of North Point to the extent that such Losses of North Point were caused by: (x) the negligence or willful misconduct or wrongdoing of North Point or (y) any breach by North Point of its representations, warranties, covenants or agreements hereunder.

## 11.3    Procedure for Indemnification.

11.3.1  **Notice.** Each Party will notify promptly the other if it becomes aware of a Claim (actual or potential) by any Third Party (other than any Product Liability Claim provided for under Section 11.4) (a **"Third Party Claim"**) for which indemnification may be sought by that Party and will give such information with respect thereto as the other Party shall reasonably request.  If any proceeding (including any governmental investigation) is instituted involving any Party for which such Party may seek an indemnity under Section 11.1 or 11.2, as the case may be (the **"Indemnified Party"**), the Indemnified Party shall not make any admission or statement concerning such Third Party Claim, but shall promptly notify the other Party (the **"Indemnifying Party"**) orally and in writing and the Indemnifying Party and Indemnified Party shall meet to discuss how to respond to any Third Party Claims that are the subject matter of such proceeding.  The Indemnifying Party shall not be obligated to indemnify the Indemnified Party to the extent any admission or statement made by the Indemnified Party or any failure by such Party to notify the Indemnifying Party of the claim materially prejudices the defense of such claim.

11.3.2  **Defense of Claim.** If the Indemnifying Party elects to defend or, if local procedural rules or laws do not permit the same, elects to control the defense of a Third Party Claim, it shall be entitled to do so provided it gives notice to the Indemnified Party of its intention to do so within forty-five (45) days after the receipt of the written notice from the Indemnified Party of the potentially indemnifiable Third Party Claim (the **"Litigation Condition"**); provided, that the Indemnifying Party expressly agrees the Indemnifying Party shall be responsible for satisfying and discharging any award made to the Third Party as a result of such proceedings or settlement amount agreed with the Third Party in respect of the Third Party Claim without prejudice to any provision in this Agreement or right at law which will allow the Indemnifying Party subsequently to recover any amount from the Indemnified Party to the extent the liability under such settlement or award was attributable to the Indemnified Party.  Subject to compliance with the Litigation Condition, the Indemnifying Party shall retain counsel reasonably acceptable to the Indemnified Party (such acceptance not to be unreasonably withheld, refused, conditioned or delayed) to represent the Indemnified Party and shall pay the fees and expenses of such counsel related to such proceeding. In any such proceeding, the Indemnified Party shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of the Indemnified Party.  The Indemnified Party shall not settle any claim for which it is seeking indemnification without the prior consent of the Indemnifying Party which consent

23

Confidential

shall not be unreasonably withheld, refused, conditioned or delayed. The Indemnified Party shall, if requested by the Indemnifying Party, cooperate in all reasonable respects in the defense of such claim that is being managed and/or controlled by the Indemnifying Party. The Indemnifying Party shall not, without the written consent of the Indemnified Party (which consent shall not be unreasonably withheld, refused, conditioned or delayed), effect any settlement of any pending or threatened proceeding in which the Indemnified Party is, or based on the same set of facts could have been, a party and indemnity could have been sought hereunder by the Indemnified Party, unless such settlement includes an unconditional release of the Indemnified Party from all liability on claims that are the subject matter of such proceeding. If the Litigation Condition is not met, then neither Party shall have the right to control the defense of such Third Party Claim and the Parties shall cooperate in and be consulted on the material aspects of such defense at the each Party's own expense; provided that if the Indemnifying Party does not satisfy the Litigation Condition, the Indemnifying Party may at any subsequent time during the pendency of the relevant Third Party Claim irrevocably elect, if permitted by local procedural rules or laws, to defend and/or to control the defense of the relevant Third Party Claim so long as the Indemnifying Party also agrees to pay the reasonable fees and costs incurred by the Indemnified Party in relation to the defense of such Third Party Claim from the inception of the Third Party Claim until the date the Indemnifying Party assumes the defense or control thereof.

**11.3.3 Assumption of Defense.** Notwithstanding anything to the contrary contained herein, an Indemnified Party shall be entitled to assume the defense of any Third Party Claim with respect to the Indemnified Party, upon written notice to the Indemnifying Party pursuant to this Section 11.3, in which case (except in cases where the Indemnifying Party chooses not to assume the defense in accordance with Section 11.3.2) the Indemnifying Party shall be relieved of liability under Section 11.1 or 11.2, as applicable, solely for such Third Party Claim and related Losses.

**11.4     Product Liability Claims in the Territory.**

**11.4.1 Product Liability Claims.** Except for such Third Party Claims for which North Point is obligated to indemnify Key under Section 11.1 or Key is obligated to indemnify North Point under Section 11.2, each of Key and North Point shall be responsible for Losses (a) arising out of or resulting from any and all claims of Third Parties concerning the Products sold in the Territory and (b) that involve death or bodily injury (or allegations thereof) to any individual (each, a **"Product Liability Claims"**). All Product Liability Claims shall be shared proportionately to profit split between Key (20%) and North Point (80%).

**11.4.2 Notice of Product Liability Claims.** Each Party shall give the other prompt written notice of any Product Liability Claim (actual or potential), but the omission of such notice shall not relieve either Party from its obligations under this Section 11.4, except to the extent the other Party can establish actual prejudice and direct damages as a result thereof. With respect to each Product Liability Claim relating to Product, Key shall assume the lead role in the defense of such Product Liability Claim.

24

Confidential

**11.4.3  Lead Role.** The Party assuming the lead role shall consult with the other Party on all material aspects of, and shall obtain the prior written consent of the other Party (such consent not to be unreasonably withheld, conditioned or delayed) in respect of any material decisions to be taken with regard to, the defense, including without limitation settlement of such Product Liability Claim, and the other Party shall have a full opportunity to participate in decision-making process with respect to the strategy of such defense, and the Parties shall cooperate fully with each other in connection therewith. The other Party shall also have the right to participate in the defense of any Product Liability Claim utilizing attorneys of its choice, at its own expense. In furtherance of the Parties' cooperation, the Party assuming the lead role will consult with the other Party regarding strategic decisions, including without limitation the retention of counsel and defense of each Product Liability Claim. The Party assuming the lead role will otherwise keep the other Party fully informed of the status and progress of the defense and any settlement discussions concerning the Product Liability Claim.

**11.5  Insurance.** During the Term of this agreement, Key will maintain product liability insurance, approved by North Point, that will be expensed out of Commercialization Expense or self-insurance that meets the following requirements: (i) the insurance shall insure the respective Party and its Affiliates against all liability related to the Products (whether a Party's or its Affiliate's liability arises from such Party's or Affiliate's conduct or by virtue of a Party's or its Affiliate's participation in this Agreement), including liability for bodily injury, property damage, wrongful death, and any pertaining contractual indemnity obligations imposed by this Agreement; and (ii) the insurance shall be in amounts, respectively, that are the greater of such amounts as are (x) required by operation of law and (y) reasonable and customary in the industry for companies of comparable sizes and activities, but in no event less than the required coverage amounts by wholesale distributors based on industry standards. If either Party determines to self-insure any portion of the risks required to be insured by this Agreement, such Party shall, upon reasonable request, provide satisfactory evidence to the other Party that it can meet the insurance obligations in a manner equal to that of an insurance company authorized to do business in the State of Delaware that has a Best's Insurance Guide Rating of A:VII or higher.

**11.6  CONSEQUENTIAL DAMAGES.** EXCEPT IN THE CASE OF (1)ANY BREACH OF THE OBLIGATIONS OF CONFIDENTIALITY SET FORTH IN ARTICLE 12, (2) LOSSES ARISING FROM A PARTY'S GROSS NEGLIGENCE OR INTENTIONAL MISCONDUCT, OR (3) EACH PARTY'S INDEMNIFICATION OBLIGATIONS PURSUANT TO SECTIONS 11.1 AND 11.2, NEITHER PARTY SHALL HAVE ANY LIABILITY TO THE OTHER PARTY OR ITS AFFILIATES FOR ANY LOSS OF PROFITS, SPECIAL, INDIRECT, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR INCIDENTAL DAMAGES ARISING OUT OF OR RELATED TO THIS AGREEMENT HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY (INCLUDING NEGLIGENCE), WHETHER OR NOT A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**Article 12  - CONFIDENTIALITY**

Confidential

### 12.1    *Specific defined terms.*

12.1.1  In this Agreement, **"Confidential Information"** means all non-public, confidential or proprietary materials and information relating to the respective businesses and operations of a Party or any of its Affiliates, whether owned by them or third parties, which is disclosed by such Party (a **"disclosing Party"**) or any of its Representatives to the other Party (a **"receiving Party"**) or any of its Representatives, or that is obtained by the receiving Party or any of its Representatives, whether such information is disclosed or obtained orally, in writing, graphically, electronically or in any other format, and includes, without limitation: (i) the terms of this Agreement, as amended from time to time; (ii) all financial and business information of the disclosing Party or any of its Affiliates; (iii) all information relating to the Products, the Regulatory Filing, the API, the Dossier and the Marketing Authorization, including information regarding the formulation and manufacturing of the Products, test results, all information submitted to Regulatory Authorities, and all data, information, documentation and know-how relating to or in any way connected with each Product; and (iv) all other information of the disclosing Party or any of its Affiliates disclosed to the receiving Party or any of its Representatives that is not generally available to the public or to its competitors.

Confidential Information shall not include any information which the receiving Party can show:

a)          information which, at the time of disclosure, is publicly known or part of the public domain;

b)          information which, after disclosure, becomes publicly known or part of the public domain other than through breach of this Agreement by the receiving Party or any of its Representatives;

c)          information which the receiving Party can show, by conclusive evidence, was known to it or any of its Representatives on a non-confidential basis prior to the time of disclosure;

d)          information which was independently developed by or for the receiving Party or any of its Representatives without reliance on Confidential Information;

e)          information which becomes available to the receiving Party or any of its Representatives on a non-confidential basis from a source other than the disclosing Party or one of its Representatives.

12.1.2  In this Section 12, **"Representatives"** of a Party includes all Affiliates of such Party as well as the directors, officers, employees, agents and consultants of such Party, and those of its Affiliates.

12.2    *Confidentiality.* During the Term of this Agreement and for a period of ten (10) years after its expiration or termination, for any reason, each Party shall maintain in strict confidence all Confidential Information of the other Party and its Affiliates. Each Party

26

Confidential

agrees that it shall not use Confidential Information of the other Party or any of its Affiliates for any purpose other than in the performance of its obligations herein and that it shall treat all such Confidential Information with the same degree of care it would with its own Confidential Information and in no case with less than reasonable care. Each Party further agrees that it shall not reproduce any Confidential Information in any form received from the other Party, except as required for the execution of activities agreed upon by the Parties, and shall not disclose such Confidential Information to any third party (including, without limitation in connection with any publications, presentations or other disclosures), except to its Representatives who have a need to know such Confidential Information to achieve the purposes of this Agreement or as otherwise contemplated herein for the purposes of this Agreement. The receiving Party shall use Commercially Reasonable Efforts to ensure that only its Representatives who have a need to know or need to access the Confidential Information will have such knowledge or access, the whole solely in relation to the fulfillment of and compliance with this Agreement.  Each Party shall ensure that its Representatives are informed of the confidential nature of and duty not to disclose the information, and is obligated to maintain the confidentiality thereof, and each Party shall remain responsible for any inappropriate disclosure made by any of its Representatives.

12.3    *Legally Required Disclosure.* If the receiving Party or any of its Representatives becomes legally compelled (whether by law, rule, regulation, subpoena or similar court or other lawful process) to disclose Confidential Information, the receiving Party shall promptly notify the disclosing Party (if legally permissible and timely possible) so that the disclosing Party may (but it need not) seek a protective order or other appropriate remedy, with the receiving Party's reasonable cooperation, or waive compliance with the provisions of this Agreement. In any event, the receiving Party (or its representative, as applicable) will furnish only that portion of the Confidential Information which, acting reasonably, it believes is legally required and will exercise Commercially Reasonable Efforts to obtain reliable assurances that confidential treatment will be accorded to such Confidential Information.

12.4    *Return and Destruction of Confidential Information.*  Promptly upon receipt of a written request from the disclosing Party, the receiving Party will return all Confidential Information consisting of original documents received from the disclosing Party or any of its Representatives and it will destroy all other Confidential Information that is in tangible form and is in its or any of its Representatives' possession, without retaining copies. The receiving Party, however, will have no obligation to retrieve and destroy Confidential Information stored and retained on its or any of its Representatives' back-up data storage systems and tapes as part of their respective ordinary course procedures or as required by law. In addition, the receiving Party may retain copy of Confidential Information for archival or compliance purposes. Promptly upon receipt of a written request from the disclosing Party, the receiving Party will certify such return or destruction in writing. The return or destruction of the Confidential Information shall not affect the obligation of the receiving Party to maintain the confidentiality thereof in accordance with this Agreement.

12.5    *Threatening Event.* Without limiting any of the provisions of this Agreement, each Party hereby agrees to use Commercially Reasonable Efforts to promptly inform the other

27

Confidential

Party should it become aware of any event threatening the confidentiality of the Confidential Information disclosed to it or any of its Representatives and to take all reasonable measures required to minimize any damage resulting therefrom.

12.6    *No Publicity.* Key acknowledges and agrees that North Point shall be entitled to refer to Key as the co-exclusive distributor, promoter and seller of the Products in the Territory, and to also refer to Key's Affiliates and Third-Party Distributors, as applicable. Without limiting the foregoing, except as required by applicable Law, neither Party shall generate any publicity, news release or other public announcements, written or oral, whether to the public press, to stockholders, or otherwise, relating to this Agreement, any amendment hereto, performance hereunder or the existence of an arrangement between the Parties without the prior written approval of the other Party, which approval shall not be unreasonably withheld.  Nothing in this provision shall be deemed to prevent a Party from making such disclosures or announcements that, in the opinion of legal counsel, are legally required of such Party; provided that in any event the non-disclosing Party shall have the right to review any such disclosure and revise such disclosure to the extent it relates to the use of the non-disclosing Party's name or Confidential Information.

## Article 13    INTELLECTUAL PROPERTY

### 13.1    Use of Trademarks.

13.1.1  The Parties shall use the Key Trademark, North Point Trademark and the Product Trademark with the necessary trademark designations and the Parties shall use Commercially Reasonable Efforts to use the respective Key Trademark, North Point Trademark and the Product Trademark in a manner that does not derogate from the Parties' rights in the respective trademarks, names and logos and the Parties will take no action that will interfere or diminish the Parties' rights in their respective trademarks, names and logos.  The Parties agree that all use of the other's trademarks, names and logos will inure to the benefit of the owner of such trademarks, names and logos.

13.1.2  During the Term, North Point shall ensure that the Commercialization of the Product with which the Product Trademark is used is maintained at a level of quality equal to or greater than the level of quality maintained immediately prior to the Effective Date hereof, or any quality standards which may be provided by North Point to Key from time to time with respect to the use of the Product Trademarks.

13.1.3  Neither Party shall modify or alter the Product Trademarks in any way, including the format, color, or font used. Neither Party shall, by action or inaction, directly or indirectly, do anything likely to destroy, impair, challenge, diminish, or dilute the value or reputation of the Product Trademarks, any of North Point's claim thereto, or the goodwill associated therewith.

13.1.4  Both Parties shall use their reasonable best efforts to fully correct and remedy, or cause to be corrected and remedied, any deficiencies in its use of the Product Trademarks, the quality of the Products associated with the Product Trademarks, and the advertising or promotion thereof, upon receipt of written notice from the other.

28

Confidential

13.2   *Ownership.*

13.2.1  Dossier and Intellectual Property Rights. Key expressly acknowledges and agrees that subject to the license granted pursuant to Section 2.1, the Licensed Intellectual Property, including all Inventions pertaining to the Products and all trade secrets, know how, data, works of authorship, and the like, pertaining to the Products and developed, conceived, or reduced to practice pursuant to the terms of this Agreement and all Intellectual Property rights therein and thereto shall be owned exclusively by North Point, and Key shall have no rights or claims in relation thereto except if such rights or claims have been expressly granted to Key by North Point in writing.

13.2.2  No Contestation. Key hereby agrees not to, directly or indirectly, contest any Licensed Intellectual Property.

13.2.3  Each Party shall promptly notify the other Party if any Third-Party claims or asserts that any Product manufactured, used, sold, or commercialized by or under the authority of either Party infringes the Intellectual Property rights of any Third Party or misappropriates proprietary information of a Third Party, or otherwise threatens or initiates any litigation or proceeding that could impact the commercialization of the Products in the Territory.

13.2.4  *Trademark registration.* To the extent not already registered, North Point shall be responsible for using Commercially Reasonable Efforts to register and maintain the registration for the Product Trademarks in the Territory, at its sole cost and expense.

13.3   *Patent Infringement Claims.* North Point is solely responsible for ensuring that each Product does not infringe, violate, or misappropriate the Intellectual Property rights or other proprietary rights of any third party in the Territory.

**Article 14   ANTI-CORRUPTION**

14.1   In this Agreement:

14.1.1  **"Anti-Corruption Laws"** means all of the laws, rules, regulations and other legally binding measures relating to bribery, corruption, money laundering, fraud or similar activities, applicable to a Party, including the US Foreign Corrupt Practices Act (FCPA).

14.1.2  **"Government Official"** means (a) any officer, employee, director, principal, consultant, agent, or representative, whether appointed or elected, of any government (whether Central, Federal, State or Provincial), ministry, body, department, agency, instrumentality or part thereof, of any public international organization, or any state owned or state controlled entity, agency, hospital or enterprise or joint venture/partnership (including a Key or shareholder of such an enterprise); and (b) any person acting in an official capacity for or on behalf of: (i) any government, ministry, body, department, agency, instrumentality or part thereof; or (ii) any public international organization; or (iii) any political party or political party official or candidate for office and, (c) persons qualified to prescribe, recommend, administer or supply pharmaceutical products, when employed within the public hospitals or institutions.

29

Confidential

14.2    Each Party warrants and covenants that with respect to the performance of its obligations under the Agreement or to any matter arising out of or in connection with the Agreement, it will comply with applicable Anti-Corruption Laws and notably:

14.2.1  will not offer any advantage to any Government Official or to any person or entity which would violate applicable Anti-Corruption Laws; and

14.2.2  will not request, directly or indirectly, any person, to perform any service, action or inaction or any advantage which would violate applicable Anti-Corruption Laws.

14.3    Failure to comply with the provisions of this Section 13 may constitute a breach of the Agreement and in such event the non-defaulting Party shall have the right to terminate the Agreement, with immediate effect by transmitting a written notice to the defaulting Party.

**Article 15    – GENERAL PROVISIONS**

15.1    *Notice.* Any notice required or permitted to be given hereunder shall be in writing and shall be delivered personally by hand, by express service courier, by email or by facsimile transmission, and shall be addressed to the Party to whom it is to be given at the address, e-mail address or facsimile number shown below, or at any such other address, e-mail address or facsimile number as either Party may designate by written notice so given to the other Party in accordance herewith:

In the case of Key at:

Key Therapeutics, Inc
Attn: Legal
232 Market Street
Building K
Flowood, MS  39232
e-mail:  rsims@keytherapeutics.net


And in the case of North Point at:

North Point Rx LLC
109 E 17th St
Ste 450
Cheyenne, WY 82001
e-mail:  don@northpointrx.com

Any such notice or other document shall be deemed to have been given and received on the date of delivery, if received prior to 5:00 p.m., local time on a Business Day; if the notice is received after 5:00 p.m., local time on a Business Day, or is received on a day which is not a Business Day, then such notice shall be deemed to have been given and received on the first Business Day thereafter.

30

Confidential

15.2    *Relationship of the Parties.* The relationship of the Parties is that of independent contractors. This Agreement does not constitute any one Party hereto as the agent or legal representative of the other Party for any purpose whatsoever. Neither of the Parties grants to the other any right or authority to assume or create any obligation or responsibility, express or implied, on behalf of it or in its name in any manner whatsoever, unless otherwise agreed to in writing by the other Party. This Agreement shall not be interpreted as creating a joint venture or partnership between the Parties.

15.3    *Assignment and Change of Control.* This Agreement shall be binding upon and enure to the benefit of the Parties hereto and their respective successors and permitted assigns.

15.3.1  Assignment. Neither Party may assign any of its rights or benefits under this Agreement, or transfer any of its duties or obligations, in whole or in part, except with the prior written consent of the other Party.

15.3.2  Effects. Any assignment or transfer by a Party other than in accordance with the terms hereof shall be null and void and shall entitle the other Party to terminate this Agreement with immediate effect.

15.4    *Cumulative Remedies.* Unless expressly provided otherwise in this Agreement, all remedies provided for hereunder shall be cumulative of and in addition to any and all other remedies, at law or in equity, which any Party may have, and the exercise of any one or more of such remedies shall not preclude the exercise of any others.

15.5    *Force Majeure.* Neither Party shall be liable for any delay or default in performing hereunder if such delay or default is caused by conditions beyond its reasonable control including acts of God, government restrictions (including the denial or cancellation of an export or other necessary licenses not due to any fault of such party), wars, insurrections, and/or any other cause beyond the reasonable control of the Party whose performance is affected (the "**Affected Party**") (a "**Force Majeure Event**") provided that:

15.5.1  the Affected Party gives immediately to the other Party a written notice of the Force Majeure Event, which notice shall include an estimate of the duration and the likely impact of the Force Majeure Event;

15.5.2  the suspension or delay of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure Event; and

15.5.3  the Affected Party uses Commercially Reasonable Efforts to correct, cure or overcome the Force Majeure Event.

In the event that the Force Majeure Event continues for a period longer than one hundred and twenty (120) days, the non-Affected Party shall have the right to terminate this Agreement upon at least sixty (60) day prior written notice to the Affected Party.

31

Confidential

15.6  *Governing Law and arbitration.*

15.6.1  Governing Laws. This Agreement shall be governed by and construed in accordance with laws of New York, USA, without regards to any conflict of law provisions. Furthermore, and without limiting the generality of the foregoing, the Parties specifically exclude the application of the United Nations Convention on Contracts for the International Sale of Goods.

15.6.2  Dispute Resolution. All disputes, controversies or claims arising out or relating to this Agreement (including its interpretation and its enforcement) arising out or relating to this Agreement shall be resolved by binding arbitration under the Rules of Arbitration of the International Chamber of Commerce (the "ICC Rules"), except to the extent of conflicts between the ICC Rules and the provisions of this Agreement, in which event the provisions of this Agreement shall prevail. The following provisions shall apply to an arbitration commenced pursuant to this clause:

(a)  The number of arbitrators shall be one, who shall be appointed in accordance with the ICC Rules.

(b)  The place or legal seat of the arbitration shall be New York, NY, USA.

(c)  The language to be used in all aspects of the arbitration shall be English.

(d)  All awards issued by the arbitral tribunal shall be final, non-appealable and binding on the Parties. Any award may be filed in any court of competent jurisdiction and may be enforced by a Party as a final judgment in such court. The Parties expressly waive, to the maximum extent permitted by law, any right of appeal of any award.

15.7  *Severability.* If any provision in this Agreement is held to be invalid, void or unenforceable, then the remainder of this Agreement, or the application of such provision to the Parties or to the circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and shall be enforced to the fullest extent permitted by law. The Parties agree to renegotiate any such invalid, void or unenforceable provision in good faith in order to provide a reasonably acceptable alternative consistent with the basic purposes of this Agreement.

15.8  *Entire Agreement.* This Agreement (including the Schedules attached to this Agreement and any amendments hereto), constitutes the entire agreement of the Parties, and supersedes all previous understandings and agreements between the Parties, whether written or oral, in respect of the subject matter hereof.

15.9  *No Waiver; Amendment.* No amendment or waiver of any provision of this Agreement shall be binding on either Party unless agreed to in writing by such party. No waiver of any provision of this Agreement shall constitute a waiver of any other provision, nor shall any waiver of any provision of this Agreement constitute a continuing waiver unless otherwise expressly provided. No failure to act shall constitute a renunciation of any right on the part of that Party.

32

Confidential

15.10   *Counterparts and Electronic Signatures.*   This Agreement and all documents delivered by the Parties under or in connection with this Agreement may a) be signed in one or more counterparts, each of which shall be deemed to be an original, but when taken together shall constitute one and the same instrument; and b) be executed by electronic signature (e.g. DocuSign, Adobe Sign or similar electronic signature technology) or by the transmission by facsimile, email or other means of electronic transmission of an executed counterpart thereof, and any such signature shall for all purposes have the same validity, legal effect and admissibility in evidence as an original signature.

[Signature page follows]

*ewS*

33



Confidential

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement by the signature of their duly authorized representative(s) as of the Effective Date.

**NORTH POINT RX, LLC**

By: _Donald Rowe_
Name: Donald Rowe
Title: President
Date: 7/8/22

**KEY THERAPEUTICS, INC**

By: _Robert W. Sims_
Name: Robert W. Sims
Title: President / CEO
Date: 7/8/22

34

Confidential

## Schedule A
### Products, Asset Purchase, Initial Batches, Financial Terms and Other Conditions

1.     **Profit Share**

Net Profits for each Product shall be shared by the Parties in accordance with the following percentages, and payable as set forth below:

North Point Profit Share 80%

Key Profit Share 20%

Within twenty (20) calendar days following the end of the first full calendar month following the date of the First Commercial Sale and after the end of each calendar month thereafter and within one hundred eighty (180) days after expiration or termination of this Agreement, Key shall calculate the Net Sales, the Commercialization Expenses, the Transfer Price, and the Net Profits obtained from the sale of each Product during such calendar month just ended and shall distribute to North Point a payment equal to eighty percent (80%) of such Net Profits for such calendar month for such Product and Key shall retain twenty percent (20%) of such Net Profits (each Party's "**Profit Share**").

In order to calculate the amount of the Net Profits retained by Key according to its Profit Share, and the amount of Net Profits to be distributed by Key to North Point, Key shall submit to North Point a monthly report specifying the number of units of each Product sold in the applicable month, an accounting of Sales Deductions, and Transfer Price for each such unit, a calculation of Net Sales, the customer to whom each unit was sold, an accounting of Commercialization Expenses for such month, and a calculation of each Party's Profit Share of Net Profits (each, a "**Sales Report**") in a report format to be agreed upon between the Parties, which will provide enough detail for North Point to confirm the accuracy of the amount of the Net Profits to be retained by Key and the remaining Net Profits to be paid to North Point by Key. The Sales Report shall be provided by Key to North Point within twenty (20) calendar days following the last day of each month, starting at the end of the first full month after the First Commercial Sale of the Product in the Territory. For clarity, if the total Transfer Price and Commercialization Expenses incurred by Key and North Point in a calendar month exceed the Gross Sales received from sales of the Products during such calendar month, then Net Profits will be zero and the amount of the Net Profits owed retained by Key or distributed to North Point shall be zero.

<u>True-Up Reports</u>.   The Sales Reports provided hereunder will be subject to true-up adjustment to take into account Sales Deductions either (a) allowed during a month that were not accrued during such month, or (b) accrued during a month but not taken or later subject to a reversal following the end of such month (each of (a) and (b), a "**True-up Adjustment**"). Each Sales Report provided by Key hereunder with respect to a month shall

35

Confidential

set forth the amount of any True-up Adjustment applicable to any month during the Term prior to the month to which such Sales Report relates.

Late Payments. If a Party does not receive payment of any sum due to it on or before the due date therefor, simple interest shall thereafter accrue on the sum due to such Party from the due date until the date of payment at a per-annum rate of prime plus two (2) percentage points or the maximum rate allowable by applicable Laws, whichever is less.

Manner of Payment. All payments owed under this Agreement shall be made in United States Dollars ($US) by wire transfer in immediately available funds to a bank and account in the United States designated in writing by the Party receiving payment.

2.      **Records and Audit Right**

During the Term and for a period of nine (9) months thereafter, Key shall keep, and will require that its Affiliates keep, accurate and adequate records of all amounts of Products sold that are required to be reported to North Point hereunder (the "**Records**"). Key shall at the written request of North Point and subject to a reasonable notice period of no less than forty-five (45) days, permit a mutually agreed upon independent certified public auditor to audit, and no more than once per calendar year, the Records to determine the correctness and accuracy of the relevant information provided by Key and payments owing, due and/or paid by Key to North Point pursuant to this Agreement. Such auditor shall enter into a confidentiality agreement reasonably satisfactory to both Parties. A copy of the auditor's reports shall be submitted to Key and North Point. If the independent certified public auditor finds discrepancies in the report of Key paying North Point incorrect payments, either positive or negative, Key shall pay to North Point the difference if North Point is owed within fifteen (15) days if to the negative, North Point shall pay to Key the difference if Key is owed within fifteen (15) days if to the positive. North Point shall be responsible for the entire costs of the audit, provided, however, that if the audit discloses an underpayment by Key of more than fifteen percent (15%) of the amount due for the audited period, then the reasonable fees and expenses charged by the auditor shall be paid by Key.

3.      **Commercialization Expenses**

Commercialization Expenses shall include the approved actual and documented out-of-pocket expenses (without mark-up and not including overhead) incurred by Key and North Point for the following with respect to the commercialization of the Products in the Territory during the Term, which expenses shall be consistent with the amount for such expenses set forth in the Commercialization Budget:

- 3PL fees
- Shipping fees
- Credit card transaction fees
- Underwriting fees (order insurance) if customers are given terms
- Product liability insurance
- Serialization

36

Confidential

- Pharmacovigilance
- FDA filing fees / PDUFA fees
- Cost of expired inventory and destruction cost
- CMMS related expenses
- Trademark license fees
- Tech transfer expenses and other CMO expenses related to the transition of the Products

The following expenses may be included in Commercial Expenses to the extent approved in advance in writing by North Point:

- Other marketing expenses
- Subscription and License fees (ex. DEA, state boards, etc)
- Website development expenses
- Data Fees – IMS / IQVIA / NCPDP
- Other expenses

No expenses other than those listed above will be included in Commercialization Expenses without the prior consent of North Point.

Key shall establish a new bank account, at a national banking institution acceptable to both Key and North Point, in their reasonable discretion, which account will be in the name of Key and which shall be used for the deposit of all Gross Sales from sales of the Products and the expenditure of Sales Deductions, Transfer Price, and Commercialization Expenses in accordance with the Commercialization Budget and the terms hereof. Immediately upon establishment of such account, Key shall notify North Point in writing of the bank and the account number. Key shall deposit the full Gross Sales directly into such bank account. Such bank account shall be used for no other purpose other than to deposit Gross Sales and to pay amounts permitted to be paid as Sales Deductions, Commercialization Expenses, and Transfer Price. As collateral security for the payment and performance of obligations and liabilities of Key under this Agreement, including without limitation the obligation to pay to North Point all amounts due and payable hereunder, Key hereby grants to North Point a first priority perfected lien and security interest in and to all of Key's right, title and interest in and to the bank account referenced above ("Pledged Account") and all cash deposited therein. In connection with such grant of security, immediately following creation of the Pledged Account, Key shall cause the bank to enter into a tri-party deposit account control agreement among Key, such bank, and North Point, pursuant to which North Point shall obtain a first priority perfected security interest in such Pledged Account. Key shall not permit the account to be subject to any lien or encumbrance, other than in favor of North Point.

North Point will designate one (1) named representative who will have complete visibility to the account at their discretion and unhampered by any representative of Key. Upon termination or expiration of the agreement, the Pledged Account will be transferred to North Point in accordance with the transition plan.

37

Confidential

In the event that the Net Sales from sales of the Products in any calendar month are less than the sum of the approved and defined Commercialization Expenses plus the Transfer Price, then North Point shall be responsible for any excess Commercialization Expenses incurred in accordance with the terms of this Agreement (the "**Excess Commercialization Expenses**"), provided that in any subsequent calendar month in which Net Sales exceed the sum of approved and defined Commercialization Expenses plus the Transfer Price, the percentage of Net Profits paid to North Point shall be increased to reimburse North Point for the Excess Commercialization Expenses until such Excess Commercialization Expenses are reimbursed in full.